# CHARLESTON.

REGINA O'DELL *v.* A. C. LAWRENCE *et als.*

Submitted April 25, 1922.          Decided May 2, 1922

1. DEEDS—*Annullment for Fraud—Proof of Fraud Must be Made by Direct or Circumstantial Evidence or Both.*

   Where a deed is sought to be annulled because of actual fraud in its procurement, the fraud charged must be clearly proved by direct or circumstantial evidence, or by both. (p. 105).

2. SAME—*Cancellation for Inadequacy of Consideration—Things Entering Into Determination of Inadequacy—Subsequent Use and Development of Property Not a Controlling Factor, and Does Not Prove Fraud.*

   To justify the cancellation of a deed for inadequacy of consideration the price paid must be so grossly inadequate as to shock the conscience of the chancellor before it can amount to convincing proof of fraud; and in determining the question of inadequacy, the situation of the parties, the character, location and intended use of the property conveyed, the risks of profit or loss from its use and development; and all the facts and circumstances existing at the time of the conveyance should be considered. The subsequent use and development of the property resulting in large profits to the grantee is not a controlling factor, and does not of itself prove fraud. (p. 105).

3. SAME—*Cancellation of for Fraud—Conflicting Evidence Will Not Justify Disturbing a Decree Denying Relief Prayed for Unless Same is Clearly Erroneous.*

   Where fraud is relied upon to justify the cancellation of a deed, and the evidence is conflicting, a decree denying relief

prayed for, unless clearly erroneous, will not be disturbed by the appellate court.  (p. 105).

(LIVELY. JUDGE, absent).

Appeal from Circuit Court, Kanawha County.

Suit by Regina O'Dell against A. C. Lawrence and others. Decree for defendants and plaintiff appeals.

*Affirmed.*

*Conley & Johnson,* for appellant.
*W. E. R. Byrne,* for appellees.

LIVELY, JUDGE:

The decree complained of denied the relief prayed for and dismissed plaintiff's original, amended and supplemental bills.

The suit is for the purpose of setting aside an option dated July 27, 1918, from the plaintiff to R. C. Britton and Charles W. Good, and the assignment thereof from them to V. L. Black, trustee; and to set aside a deed from plaintiff to said Black, trustee, dated July 31, 1918, and a deed from said Black, trustee, to defendant A. C. Lawrence, and others, dated November 6, 1918; and for an accounting and disclosure of 1-8 part of the royalty oil produced from the lot of land described in said option and deeds, and a recovery for the amount so ascertained in favor of plaintiff; and the appointment of a receiver to take charge of the property described in said option and deeds. For some time prior to July, 1918, plaintiff owned in fee a small lot of land on Kelly's Creek in Cabin Creek District, of Kanawha County, on which was a small dwelling house where she formerly resided, and which lay between two other lots designated as the Thomas Burke lot and the Hudnall lot. She had executed an oil and gas lease thereon to the United Fuel Gas Company in the usual form, in which she reserved to herself 1-8 of the oil and a certain sum per year for each gas well which might be ·drilled thereon. The option was for sale of the fee for the sum of $4,000.00, and the deed completed the option contract. She charged that defendants Lawrence, W. H.

O'Dell, and R. C. Britton, obtained this option and deed from her by false and fraudulent representations which were relied upon by her as true. Each of the defendants answered the bill, specifically denying the charges of fraudulent misrepresentations made therein; and numerous depositions were taken. Plaintiff was a widow, 62 years of age, and owned this small lot containing 12,949 sq. ft. At the times the option and deed were executed she resided in the city of Charleston and was at her daughter's house, having recently undergone a major operation at a hospital, and was then convalescent. On July 22, 1918, an oil well was drilled in on the Hudnall lot within a few feet of her lot and produced about 1800 barrels of oil each day. This well was formerly a gas producer, and had been previously drilled down within 80 to 100 feet of the "Weir" sand which contained the oil. The well on the Burke lot, which was within a few feet of her lot, was also a gas well and as soon as the oil was discovered in the "Weir" sand by sinking the Hudnall well preparations were hurriedly made by the owners to drill that well down to the oil. The defendant, W. H. O'Dell, a nephew of the plaintiff, was in the real estate business in the city, and when reports of the strike of oil on the Hudnall property became current he approached her with a view of buying her lot from her, or selling it for her; including her royalty interest therein. She had formerly offered the property at $1,000.00 but the price talked of between them was $2,000.00. As a result of the conference between them, he undertook to sell the property and attempted to interest purchasers therein. At that time she had received a letter from her niece, who lived within a mile of the property, informing her that oil had been found on the Hudnall lot. She admits having received this letter, but defendant O'Dell testifies that the letter was received from her son, Freel O'Dell, who lived near the property, giving her full information about the oil strike on the Hudnall lot, and which letter he saw at that time, and that she then told him she wanted to sell her property, but fixed no price. On the same day, or probably the following day, defendant, R. C. Britton, inquired of W. H. O'Dell over the telephone about the property and was informed that

it belonged to plaintiff. Britton and W. H. O'Dell at that time were strangers to each other. Britton immediately went to see the plaintiff and offered her $4,000.00 for her interest in the property and afterwards communicated his offer by 'phone to his co-defendant, W. H. O'Dell. They arranged to meet at the home of the plaintiff on the following morning for the purpose of obtaining an option. In accordance with this arrangement they went there and were introduced to each other, being the first time they had ever met. The property was optioned at the price of $4,000.00, and $100.00 paid in cash, the option being taken in the name of Britton and C. W. Good. W. H. O'Dell states that Good consented that his name might be used and gave as a reason therefor that he did not desire to take the option in his own name because it would create a jealousy on the part of plaintiff's sons. This option was taken on Saturday, and on the following day defendant Lawrence, who had purchased the Burke well from the Montgomery Gas Company, or had contracted for it, came to the plaintiff and desired to purchase her property, but upon being told that she had executed an option to O'Dell and Britton he informed her that her interest in the lot was worth at least $5,000.00, and advised her to break the option, so she said. He was referred by her to her nephew and Britton stating that they had the property optioned. Lawrence went immediately to defendant O'Dell, who was at that time a stranger, and made inquiries looking toward a purchase of his option, which inquiries followed by negotiations terminating on the following Monday in a contract by which Lawrence purchased the option from O'Dell and Britton in which he agreed to exchange for the same an undivided 1-48 interest to each in the royalty in the O'Dell lot and in the Burke lot and pay the $4,000.00 to plaintiff when she made the deed. At the same time Lawrence purchased the oil and gas lease thereon from the United Fuel Gas Company except the 1-8 interest, for which Lawrence agreed to exchange a 1-8 interest in the Burke lot. Lawrence's contract of purchase of the Burke well resulted in litigation and failed of consummation. He immediately notified Britton and O'Dell that he would be unable to give

them the 1-48 interest in the Burke well, as he had agreed, and gave them the privilege and opportunity of canceling the contract with him for purchase of the O'Dell lot, advising them of litigation then brewing over his purchase of the Burke well. They elected to hold him to his agreement of purchase of the O'Dell option, with some modification of the consideration, and on the 31st of July a deed was prepared which plaintiff in a day or so thereafter executed, conveying the lot in question to Black, trustee, for the purchase price of $4,000.00. This is the deed which plaintiff seeks to annul for fraud and misrepresentation on the part of Britton, O'Dell and Lawrence at the time of its procurement. A day or two after the option had been given, Freel O'Dell, a son of plaintiff, and who lived at the village of Mammoth within a very short distance of his mother's lot, visited her in Charleston and informed her of the oil development. She became dissatisfied with her bargain, and in company with her son consulted an attorney, laying before him the facts and circumstances under which the option was given. At that time she knew that defendant O'Dell, her nephew, was a part owner of the option contract, although it was taken in the name of Britton and Good. A few days later the option was called and Britton, W. H. O'Dell, and H. C. Young, the latter being in the employ of Lawrence as bookkeeper, met at plaintiff's abode for the purpose of having the deed executed. Young had the $4,000.00 which Lawrence had agred to pay, and was present for the purpose of turning over the money to her when the deed was executed. and taking her acknowledgment as a Notary. Freel O'Dell was present, and protested against the closing of the trade. A heated discussion and controversy arose and much evidence has been taken of what was there said and done. Plaintiff was fully advised of all the facts at that time. It was insisted on one side that she had been imposed upon when the option was given, and that the price stipulated was inadequate. On the other side it was contended that the price agreed upon was fair in view of the uncertainty of operations of this character, and in view of the fact that the Hudnall well and the Burke well on either side of the lot would

rapidly deplete the oil before a well on her lot could be sunk. Plaintiff finally concluded that she would take the money offered and signed the deed. Pending the discussion defendant, W. H. O'Dell, proposed to relinquish his one-half interest in the option to plaintiff, but upon advice of her son, she did not accept the offer of relinquishment. The $4,000.00 was paid her, the deed delivered and duly placed to record. When Lawrence contracted with the United Fuel Gas Co. for its lease on the O'Dell lot, and for the purchase of the Britton and O'Dell option thereon, it was contemplated that the oil thereunder would be extracted through the well of the Burke lease which he had then purchased, or had contracted to purchase. It would take a very short time and little expense to sink the Burke well into the "Weir" sand, whereas, it would require 45 or 60 days and large expense to sink a well on the O'Dell lot, and time was of great importance, as the Hudnall well was in full operation and four or five other gas wells in the near vicinity were about to be drilled into the oil bearing sand. But upon failure of his contract of purchase of the Burke lot, and resultant litigation, he immediately began drilling on the O'Dell lot and completed his well on the 19th day of October which produced about 250 barrels per day; and on the 9th of December following a second well on the same lot was completed. These two wells have been steady producers gradually lessening in flow, and in January 1920, it was computed that 1-8 royalty therein would amount to over $17,000.00. No action seems to have been taken by plaintiff and no complaint made until after the first well came in as a good producer. This suit was instituted on November 12, 1918. Fraud and misrepresentation are charged against Britton and W. H. O'Dell in procuring the option from plaintiff. She testified that she had not visited her property for six or seven months prior to the transactions and knew nothing of its value as an oil property, and knew nothing of the oil development except what had been written to her by some relative living at Mammoth. She was weak and nervous at the time, having undergone a recent surgical operation, and was confined to her bed a portion of the time;

that both her nephew and Britton were well informed of the value of her property; that her nephew was insistent upon her to give him an option but was refused; that he falsely represented to her that the lessee of her property would surrender its lease on her lot within ten days because it was too small for a well to be drilled thereon, and that the oil would be drained by the surrounding wells.    That when she refused to give her nephew the option, Britton called on her and offered her $4,000.00, falsely representing that the Hudnall well would not amount to much, that it had a gas well pressure and would cease in a month or two; that her lot was not fit for a well, and he wanted it for location of tanks; and that the well above and below her property would drain the oil before one could be sunk on her lot.    She says that her nephew advised her to accept Britton's offer, and concealed from her the fact that he was interested with Britton.    To sustain the allegation in her bill that Lawrence conspired and combined with Britton and O'Dell to defraud her out of her property, it is pointed out that H. C. Young was present at the time of the execution of the deed, paid the $4,000.00 furnished by Lawrence, was his agent, and said to Freel O'Dell when the controversy was in progress, "Young man, you ain't got no sense; you are a fool; you don't know what you are talking about," and "$4,000.00 will cover that property up."    Young states that he was bookkeeper for Lawrence at the time and a Notary Public and went to plaintiff's house to deliver her the check for $4,000.00 when she signed the deed, that he did not make the remark attributed to him and took no part in the discussion; that Mrs. O'Dell made no objection to signing the deed although her son Freel was interposing objection and seemed to be mad because she would not heed his advice.    Plaintiff's daughter and son were present.    He says he heard no misrepresentations made, that W. H. O'Dell offered to withdraw from the transaction, but that plaintiff said she thought it a good deal and said she was going to sell, and freely and voluntarily signed the deed.    Britton and W. H. O'Dell deny any misrepresentations on their part and detail minutely

what occurred, both testifying that after the matter had been fully discussed, plaintiff announced her intention of taking a sure sum rather than take a chance, and voluntarily signed with full knowledge. The evidence of what was said and done at this meeting is somewhat conflicting. It is reasonably clear that Young made no representations and took no part in the discussion, and in no way attempted to advise or influence the plaintiff. We can see no evidence which can be construed to connect Lawrence with fraud or misrepresentation. He did not combine and conspire with Britton and O'Dell to cheat and defraud plaintiff. On the contrary when he found that she had optioned her property to them, he told her that her property was worth more than the option price. He then went to them and purchased their option by giving them a greater price, the $4,000.00 to be paid Mrs. O'Dell, and to each a 1-48 interest in the O'Dell and Burke lots. At the time she made the deed in pursuance of the option she had all the information concerning the progress of the oil development, and the probable value of her lot, that the purchasers had, and was fully informed of the interest of her nephew in the transaction. She had before that time consulted counsel and the evidence and circumstances indicate strongly that she executed the deed voluntarily and after full information, and due deliberation. If she desired to rely upon the alleged misrepresentations on the part of Britton and O'Dell made when she gave the option, then was the time she should have acted, and refused to execute the deed. The rights of third parties intervened as a result, and as to them her deed is binding. While she was feeble in body as a result of the surgical operation, there is not the slightest suggestion that she was not mentally strong; and viewed from the standpoint of those expert in the production of oil, she made a good bargain under the circumstances. Her small lot was between two wells, each very near to her lines, one well already producing and the other within one hundred feet of the sand; other gas wells ready to be deepened were in the near vicinity; the extent of the pool was undefined, and the depletion would

be rapid. H. A. Wallace, a man of mature years, who has been engaged in the business since he was 15 years old, and noted as an expert, conservative and successful oil and gas operator, especially in drilling for and producing oil, and who was familiar with the sitation, was of the opinion that the big flow would all be gone before a well could be drilled from the surface of the O'Dell lot to producing sand, and in his opinion based on his life experience and knowledge he thought there would be very little profit, if any, in drilling a well on the O'Dell lot. The actual test demonstrated that he was mistaken. The chances were taken by Lawrence. No one knows the profound secrets which are hidden in the strata under the surface, and sad disappointments have been experienced in what appeared to be the most dazzling prospects. It will be further observed that plaintiff was at Mammoth about one-half mile away while Lawrence was sinking the well at unusual expense, and made no complaint until after it came in as a good producer. Defendant's counsel insists that she is barred by laches, and cannot now be heard to complain. The application of the doctrine of laches depends upon the circumstances of each case. Lapse of time is not a controlling element. "When a man with full knowledge, or at least with sufficient notice or means of knowledge of his rights, and of all the material circumstances of the case, freely and advisedly does anything which amounts to the recognition of a transaction, or acts in a manner inconsistent with its reputation, or lies by for a considerable time, and knowingly and deliberately permits another to deal with property, or incur expense, under the belief that the transaction has been recognized, or freely and advisedly abstains for a considerable lapse of time from impeaching it, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity." Herman on Estoppel, Vol. 2, section 1063; *Despard* v. *Despard,* 53 W. Va. 443, p. 463. In *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, a director of a corporation loaned money to it, which was secured by a deed of trust on the corporate property. A sale was made under the trust, and the creditor became the purchaser. After developments on the property made by the

purchaser at large expense had demonstrated that it was very valuable oil producing property, the corporation and its stockholders sued, claiming that the purchaser at the trust sale held the property for them as a trustee, because of his confidential and official connection with the plaintiffs at the time of the loan and purchase.    They were denied relief because they were fully cognizant of the transactions, and stood by until after the property had become valuable by defendant's skill, energy and expenditure of large sums of money.    The character of the business was hazardous, and suit was not instituted until after the hazard was over. Numerous cases of similar import may be cited.    Pomeroy Eq. sec. 1444 and note; *Johnston* v. *Standard Mining Co.*, 148 U. S. 360; *Hammond* v. *Hopkins*, 143 U. S. 224; *Galliher* v. *Cadwell*, 145 U. S. 368; *Despard* v. *Despard*, 53 W. Va. 443.

But in our view it is not necessary to consider whether plaintiff is barred by laches.    It is fundamental that where fraud is asserted as a ground for equitable relief, it must be proven clearly either by direct evidence or by facts and circumstances which impel its conclusion.    *Mullen* v. *Searls*, 69 W. Va. 790; *Deepwater* v. *Renick*, 59 W. Va. 343; *Frank* v. *Zeigler*, 46 W. Va. 614; *Greer* v. *O'Brien*, 36 W. Va. 277.    Wherein can fraud and misrepresentation be imputed to Lawrence?    In the only conversation he had with plaintiff he informed her that, in his opinion, she had optioned her property at too small a price.    He then did his trading with the owners of the option.    They were strangers to him, before that time.    The evidence fails to show that Young, his bookkeeper, who carried the check to her and took her acknowledgment to the deed, made any false or fraudulent representations.    The circuit court has found, upon conflicting testimony, that none of the defendants were guilty of practicing fraud upon her in procuring the option and deed, and under the well established rule we will decline to disturb the decree.    *Ross* v. *McConnaughy*, 85 W. Va. 199, 101 S. E. 443; *Baughman* v. *Hoffman*, 90 W. Va. 388, 110 S. E. 829.

*Affirmed.*