395 S.E.2d 779

**Melvin GILLILAND, Jr., Committee for Sarah Jane Gilliland, an Incompetent, Appellee,**

v.

**James N. CARPENTER, Betty E. Carpenter, Johnny H. Carpenter, and Maxine G. Carpenter, Appellants.**

**No. 19060.**

Supreme Court of Appeals of West Virginia.

July 11, 1990.

James T. Cooper, Lovett, Cooper & Glass, Charleston, for James, Betty, Johnny and Maxine Carpenter.

Charles M. Walker, James C. Reed, Jr., Charleston, Orton A. Jones, Hedges, Jones, Whittier & Hedges, Spencer, for Melvin Gilliland, Jr.

PER CURIAM:

This case is before us pursuant to an appeal by the appellants, defendants below, to an order entered by the Honorable Charles E. McCarty, Circuit Judge of Roane County. This order set aside two deeds on the basis that the grantor was mentally impaired, that the appellants, who were grantees in such deeds, took advantage of a situation of trust with the grantor, and that the purchase price paid for the property was so inadequate as to shock the conscience of a reasonable person. The appellants assert that the court committed error by granting the appellee's motion for judgment notwithstanding the advisory findings of the jury, by failing to treat the jury's findings as binding on the issue of the validity of deeds in question, by granting the appellee's motion to strike the testimony of one of the appellants' witnesses, and by denying an allowance for and a jury determination of the value of improvements made to the property contained in the questioned deeds. We affirm the circuit court.

The main issue in this case involves the validity of two deeds signed by Sarah Jane Gilliland on February 24, 1983. The property in question consists of two tracts of land, one tract consisting of 129.75 acres and the other consisting of 40 acres. These two tracts of land were formerly owned jointly by Mrs. Gilliland and her late husband, Melvin C. Gilliland, Sr. After his death in 1979, Mrs. Gilliland became the sole owner pursuant to her right of survivorship. The Gillilands lived in Chelyan, Kanawha County, and had used the subject farm property as a weekend and vacation retreat, and a place to raise a garden. After Mr. Gilliland's death in 1979, Mrs. Gilliland did not visit the Roane County farm as frequently as they had during Mr. Gilliland's life.

The appellants, James N. Carpenter and his wife Betty E. Carpenter, and Johnny Carpenter and his wife Maxine Carpenter, live close to the Roane County farm. According to Johnny Carpenter's testimony, throughout the years the Gillilands spent time at the farm, they became acquainted with and would visit with the Carpenters. After Melvin Gilliland's death, Johnny and James Carpenter looked after the farm for Mrs. Gilliland, and would keep her apprised of problems with the property, such as vandalism. In early 1983, Johnny Carpenter telephoned Mrs. Gilliland to inform her that someone had broken into the Roane County farmhouse. During this conversation, Mrs. Gilliland asked the Carpenters to come to see her at her home, and according to Johnny Carpenter she refused to discuss the reason for her requested visit over the telephone.

Sometime in the beginning of February, 1983, Johnny Carpenter, his wife Maxine, and their son James Carpenter went to see Mrs. Gilliland at her home in Chelyan. After chatting for a few moments, Mrs. Gilliland asked Johnny Carpenter if he knew anyone who might be interested in purchasing the farm in Roane County. He responded that he did not. Mrs. Gilliland then asked if he would be interested in purchasing the property. Johnny Carpenter replied he would if the price was right. According to the appellants who were

present at that time, Mrs. Gilliland then told Johnny that if he would give $2,000.00 for the smaller farm, then she would give him the other one. Johnny replied that he did not want the property that way. Mrs. Gilliland then raised the price $500.00, and Johnny again replied negatively to that offer. The conversation then turned to other unrelated matters and the topic of the farm was not brought up again until the Carpenters were leaving. At that time, Mrs. Gilliland asked Johnny if he was interested in buying the farm or not, and he told her that he was interested. Mrs. Gilliland asked what Johnny would give her for the farm, and he replied $5,000.00. Mrs. Gilliland agreed to that price and asked Johnny if he would have the deeds drawn up for her.

Johnny Carpenter contacted a lawyer in Spencer, West Virginia, to draw up the deeds. It should be noted that Johnny Carpenter and his wife Maxine were listed as the grantees on the deed for the 129.75 acres, and his son James Carpenter and his wife Betty were listed as the grantees on the deed for the 40 acres.[1] There is no evidence to indicate that anyone advised Mrs. Gilliland that James and not his father Johnny would be listed as the grantee in the deed to the 40 acres. A few weeks later, on February 24, 1983, Johnny and Maxine Carpenter returned to Mrs. Gilliland's house with the deeds. According to the testimony of Mr. and Mrs. Carpenter at trial, Mrs. Gilliland looked over the deeds for approximately one hour and then the Carpenters took Mrs. Gilliland to the National Bank of Commerce in Belle to have her signature notarized. JoAnn Tinsby, the Notary Public who witnessed Mrs. Gilliland's signature, testified at trial, but was unable to remember any significant detail concerning the signing and notarizing of the deeds. The money for the purchase price was given to Mrs. Gilliland and she deposited the sum in her bank account while they were there. The deeds were subsequently recorded in the Roane County Clerk's Office.

In July of 1983, Mrs. Gilliland was found to be suffering from malnutrition and dehydration and was hospitalized. After her hospital stay, Mrs. Gilliland was placed in a nursing home, where she presently remains. The appellee, Melvin Gilliland, Jr., secured a general power-of-attorney from Mrs. Gilliland when she was in the hospital and was appointed committee for her in April 1984.

The appellee, plaintiff below, brought suit in January 1985, to have the two subject deeds cancelled and rescinded. The appellants, defendants below, counterclaimed and denied the appellee's allegations and asserted a right to compensation for improvements made to the property in the event the respondent was successful in having the deeds set aside. Prior to the trial which began on September 29, 1987, counsel agreed that the issue of rescission was one of equity, and the court determined the jury was to serve merely in an advisory capacity. The trial concluded on October 2, 1987, with the advisory jury returning a verdict in favor of the appellants. The advisory jury found that Mrs. Gilliland was not mentally incompetent to sign the deeds in question; that a relationship of trust or confidence existed between the parties at or about the time the deeds were signed; that there was no physical or mental infirmity on the part of Mrs. Gilliland at the time she signed the deeds; and that the consideration paid for property was not inadequate. The appellees made a motion for judgment notwithstanding the advisory findings of the jury, and by a letter opinion dated November 30, 1987, the court granted the appellees' motion and entered judgment for the appellee. A final order was then entered on March 28, 1988. Along with setting aside the deeds, the court also ordered that the purchase price for the property be returned to the appellants, and in addition, that the appellee pay the appellants $3,500.00 for improvements the appellants made to the property.

1. According to James Carpenter, he had approached both Melvin and Sarah Gilliland previously about purchasing this land, but at that time both Melvin and Sarah were not interested in selling.

We believe that testimony at trial revealed information sufficient to uphold the court's decision to set aside the deeds in question. We arrive at this decision by concluding that due to a combination of mental weakness and inadequacy of consideration, the deeds signed by Sarah Gilliland on February 24, 1983, are invalid.

There was evidence adduced at trial which indicated that Mrs. Gilliland was suffering from a somewhat diminished mental capacity. Daniel Scott, a minister and friend of the family, testified by deposition that during the summer of 1982, Mrs. Gilliland telephoned him and told him she wished to donate two parcels of land in Roane County to his church. Reverend Scott and his wife visited Mrs. Gilliland approximately two weeks later and she did not at first recall ever having discussed the sale of the property with him before. Reverend Scott reminded her of the conversation and she then remembered. Reverend Scott testified that Mrs. Gilliland "wandered in her thinking and it became apparent that she was confused in what she was discussing...." After his discussion with Mrs. Gilliland, Reverend Scott made the decision to not pursue the property transaction with her because of her mental condition at that time, which he described as "very disoriented."

Charles C. Weise, M.D., a psychiatrist, testified that he first examined Mrs. Gilliland on July 16, 1983, during a hospital psychiatric consultation almost three months after the deeds were executed. Dr. Weise found that Mrs. Gilliland had very little memory about her recent past. Dr. Weise felt that she was suffering from organic brain syndrome, and that she suffered significant impairment of her mental ability probably for a number of months prior to July 1983. In his opinion, which he indicated was within a reasonable degree of medical certainty, she did not have sufficient mental capacity to understand the matter of the transaction which occurred with the Carpenters in February 1983. John Kampsnider, a clinical psychologist, examined Mrs. Gilliland in July 1987. As a result of an examination he administered to Mrs. Gilliland, Mr. Kampsnider found her to be incompetent to manage her civil affairs. He also found that she suffered from a dementia, but could not draw a conclusion with regard to what her mental status would have been during the transaction with the Carpenters in 1983.

Arlene Rupnik, Mrs. Gilliland's granddaughter, testified on behalf of appellants at trial concerning her relationship with Mrs. Gilliland and her knowledge of her mental capacity at the time surrounding the transaction at issue. Mrs. Rupnik recalled a conversation she had with Mrs. Gilliland in 1983 regarding her wishes for the disposition of the Roane County property. Mrs. Rupnik testified that at a point in time in 1983,[2] Mrs. Gilliland told Mrs. Rupnik that the farm "was to go to the eldest grandson which carried the Gilliland name, and she said it wasn't to go to Jr. [Melvin Gilliland, Jr.,] because of personal conflicts that they had through their lifetimes together, ..." Mrs. Rupnik recalled a visit with Mrs. Gilliland in December 1982. She testified that Mrs. Gilliland appeared to have lost weight, but that her mental condition appeared normal.

Mrs. Rupnik also testified concerning three visits with Mrs. Gilliland after the deeds were signed, and explained Mrs. Gilliland's mental condition at each visit. Mrs. Rupnik testified that at the end of February 1983, Mrs. Gilliland called her and asked her to come visit her because she had something to show her. Mrs. Rupnik visited Mrs. Gilliland at the end of March 1983, and she testified that Mrs. Gilliland showed her "the paper where she had sold the farm." Mrs. Rupnik testified that Mrs. Gilliland was happy about the transaction, but that she asked Mrs. Rupnik to not tell Mrs. Gilliland's children because they would not like it. Mrs. Rupnik visited with her a second time during Memorial Day weekend in 1983. Although she testified that there was nothing unusual about Mrs.

**2.** Mrs. Rupnik did not indicate if this date in 1983 was before or after the date Mrs. Gilliland signed the deeds.

Gilliland's mental condition at that time, Mrs. Rupnik did state that she had lost some weight and that she cried when anyone talked about her late husband. The next time Mrs. Rupnik saw her grandmother was later in 1983 after she had been placed in the nursing home. When asked about Mrs. Gilliland's mental condition, Mrs. Rupnik testified that she "knew what was going on around her." Mrs. Rupnik also testified that when she found out that Mrs. Gilliland had sold the farm for $5,000.00, her reaction was that she was happy for both her grandmother and the Carpenters. She further testified that if Mrs. Gilliland had only received one dollar for the property and was happy with that price, Mrs. Rupnik would be happy, too.

Along with testimony concerning Mrs. Gilliland's actual mental status surrounding the time she signed the deeds, there was testimony at trial concerning her lack of business knowledge and her inability to handle a checking account. William Moore, past president at Mrs. Gilliland's bank, testified that she frequently, when paying by check, signed her name and left the amount blank, thereby permitting the other party to fill in the amount of the check. Mr. Moore testified that he telephoned Mrs. Gilliland when he became aware of this practice and told her this was bad business and a very dangerous practice. As Mr. Moore described it, this was "common practice" with Mrs. Gilliland, and it caused her funds to rapidly diminish.

A separate issue at trial was the value of the land purchased by the Carpenters in 1983. James Barth, a real estate appraiser, testified for the appellee that he viewed the farm property in August of 1983. In his opinion, the fair market value of that property on the day the deeds were signed was $51,000.00. Both Johnny Carpenter and James Carpenter admitted during their testimony that the value of the subject property in 1983 was $9,000.00 for the 129.75 acre tract and $3,000.00 for the 40 acre tract.[3]

Although there is not strong, sufficient evidence in this record to invalidate the subject deeds solely on the basis of the grantor's diminished mental capacity, we do find sufficient evidence to invalidate such deeds when her diminished mental capacity is coupled with the inadequacy of consideration given for such property. West Virginia Code § 36–3–6 (1985)[4] provides, and we have previously held, that inadequate consideration alone will not invalidate a deed. *McElwain v. Wells*, 174 W.Va. 61, 322 S.E.2d 482 (1984); *See Farrar v. Young*, 158 W.Va. 977, 216 S.E.2d 575 (1975). In converse though, we have held that if the consideration paid is so inadequate as to "shock the conscience," it may justify cancellation of a deed. *See O'Dell v. Lawrence*, 91 W.Va. 96, 112 S.E. 297 (1922). This case presents a situation where the inadequacy of consideration is coupled with evidence of failing mental capacity of the grantor. We held in the single syllabus point of *Sheppard v. Clay Peacock Coal Co., Inc.*, 169 W.Va. 106, 285 S.E.2d 902 (1982) that "Inadequacy of consideration is persuasive, although not conclusive, evidence of mental incapacity, and where mental weakness and inadequacy of consideration coexist they may together furnish ground for invalidating a deed." *See also* C.J.S. *Deeds* § 54(c) (1956); *Hardin v. Collins*, 125 W.Va. 81, 23 S.E.2d 916 (1942).

The appellants also assert on appeal that the court committed error by granting the appellee's motion to strike the testimony of David Casto, and by denying an allowance

---

**3.** David Casto, a real estate broker and appraiser, testified on behalf of the appellants. Mr. Casto testified that the fair market value of the property was $16,000.00 in 1983. His entire testimony was struck from the record, though, because it was apparent to the court that he did not establish a proper basis for his opinion in using the market data approach because he did not use any comparable property values from the 1983 time period to arrive at his opinion that the Roane County farm had a value of $16,000.00. Mr. Casto had not even viewed the property until 1987.

**4.** W.Va.Code § 36–3–6 provides, in part: "If a deed of real property is in other respects valid, it shall not fail for want of a payment of consideration, or the recital of a consideration in the deed...."

for and a jury determination of the value of improvements made to the subject property. Since we find sufficient evidence to uphold the court's decision to set aside the deeds based on a combination of mental incompetency and inadequacy of consideration, we find the remaining assignments of error to be without significant merit and decline to address them individually.

We therefore uphold the court's decision to invalidate the deeds dated February 24, 1983, notwithstanding the advisory findings of the jury. We furthermore uphold the court's decision to order the appellee to return the purchase price of the property to the appellants, and that the appellee pay the appellants $3,500.00 for improvements made to the property.

Affirmed.