## CHARLESTON.

RAY MARTIN *et als.* v. SAMANTHA B. MOORE *et als.*

Submitted January 16, 1923.    Decided January 23, 1923.

DEEDS—*Mere age or infirmity of mind and body not sufficient to overcome mental capacity of grantor; true date of_ test for mental capacity time of execution of deed; burden on those seeking cancellation to show mental incapacity of grantor in deed; grantee's payment of attorney for services in drawing deed not indicative of mental incapacity of grantor or undue influence; testimony of notary taking acknowledgment to deed entitled to peculiar weight as to mental capacity of grantor; undue influence sufficient to set aside deed must be such as to destroy free agency of grantor; unless free agency of grantor destroyed by undue influence, showing of motive and opportunity and failing mentality insufficient to overthrow deed; suggestion and advice addressed to judgment not undue influence; deed induced by appeal to gratitude, past kindness, love, or esteem, not result of undue influence.* (p. 675).

This suit being for the purpose of annulling two deeds on the grounds of lack of mental capacity in the grantor, inadequacy of consideration, fraud and undue influence on the part of the grantees, all of which is denied by the answers, and the evidence to sustain the issues being conflicting, is governed by the principles announced in *Buckey* v. *Buckey*, 38 W. Va. 168; *Delaplain* v. *Grubb*, 44 W. Va. 612; *Teter* v. *Teter*, 59 W. Va. 449; *Woodville* v. *Woodville*, 63 W. Va. 286; *Black* v. *Post*, 67 W. Va. 253; and *Barnett* v. *Greathouse*, 77 W. Va. 514. (p. 680).

(McGINNIS, JUDGE, absent).

Appeal from Circuit Court, Wetzel County.

Suit by Ray Martin and others against Samantha B. Moore and others.   From a decree for defendants, plaintiffs appeal.

*Affirmed.*

*Edwin O. Keifer,* for appellants.
*S. Bruce Hall,* for appellees.

LIVELY, JUDGE:

This suit was instituted by Ray Martin and thirty-one others who are a portion of the heirs of Matilda Lantz, de-

ceased, and is for the purpose of the cancellation of two deeds executed by Matilda Lantz on September 18, 1919, by the first of which she conveyed to defendant, Samantha B. Moore, her niece, 189¼ acres of land in Wetzel county, reserving therefrom one-half of the oil, gas and coal therein, and which deed also granted her one-half of the oil, gas and coal within and underlying 32¾ acres of land adjoining the 189¼ acres tract. The other deed was made by her to Lula J. Allen, Lantzie L. Allen and Opal B. Allen, defendants, for the 32¾ acres adjoining the 189¼ acres tract, described in the first deed, and one-half of the oil, gas and coal within and underlying both tracts. The consideration mentioned in the first deed is love and affection for her niece, the grantee, and the further consideration that the grantee will reside with her, the grantor, on the land conveyed, and will take care of her during her declining years for and during the remainder of her natural life. The consideration in the other deed to the Allen girls is also love and affection which the grantor bears to them, and for services, aid and comfort which they had for many years prior thereto rendered to the grantor.

The suit was also for the purpose of partitioning the said two tracts in controversy as well as about 65 acres of land in said county, the title to which remained in Matilda Lantz at the time of her death, and which land was inherited from her father's estate. There is no controversy over the ownership and partition of this last mentioned tract. The two deeds of September 18, 1919, are sought to be set aside on the alleged grounds of mental incapacity of the grantor at the time the deeds were executed, arising from old age and sickness; that the consideration in the deed to Samantha Moore was grossly inadequate; that there was fraud and collusion practiced upon Mrs. Lantz by the grantees in the two deeds; and that the same were induced by undue influence exercised over her by the defendants. The answer specifically denies the charges in the bill, and details at length the facts and circumstances under which they were executed; denies that the grantor was mentally incapacitated at the time the deeds were executed; denies that the consideration in either of the deeds was inadequate; denies collusion and fraud and undue influence.

The issues having been sharply drawn by the pleadings, the parties went to proof, and numerous depositions were taken. The lower court found for the defendants, refused cancellation of the deeds; and plaintiffs prosecute this appeal.

John Lantz and his wife, Matilda (nee Clark), were married many years ago and had no children. They took into their home Nevada Clark, a daughter of a brother of Mrs. Lantz, when she was quite young, and reared her. When she attained maturity she married W. P. Allen, and there were born to them the Allen girls, to whom the 32¾ acres, with one-half of the coal, oil and gas, in the 222 acres, was conveyed, as hereinbefore set out. Allen and his wife, Nevada, continued to reside with John and Matilda Lantz, and their children were born in the home of Mrs. Lantz or possibly a short distance from her dwelling where the Allens lived a portion of the time. While the Allens lived in the Lantz home they shared things in common and were considered and treated as members of the family. About the year 1909 the Allen Family, who for some time prior thereto, had been living in their home a short distance away, at the request of John and Matilda Lantz, moved back into the Lantz home to take care of John Lantz, who had become sick and incapacitated by old age. Again the products of the farm were used in common by those living upon it, and all were considered as members of the family. In the latter part of 1910 John Lantz died, and left a will by which he devised his real estate, consisting of about 485 acres, and his personal property, to his wife, Matilda Lantz, and to Mrs. Allen and her three children; one-half of his estate to his widow and the other half to Nevada Allen and her children. The estate so devised was partitioned, and 222 acres set off and assigned to Matilda Lantz, and 263 acres set off and assigned to Mrs. Allen and her three children. Mrs. Allen died in 1912, and W. P. Allen and the three children continued to live with Matilda Lantz on the 222 acres in controversy until the spring of 1919 when W. P. Allen died, the three children remaining in the home of Mrs. Lantz.

The record discloses that the greatest love and affection mutually existed between Nevada Allen and her three children and Mrs. Lantz. The girls were extremely fond of

Mrs. Lantz, and attended to her wants with the greatest care and solicitude, and she treated them as if they were her own children. After the death of W. P. Allen it seems that two of the girls, (who all appear to be of superior intelligence and worth), had become engaged to be married, and it became generally known that they intended to leave Mrs. Lantz and establish homes of their own. All of the girls contemplated moving into their own home a short distance away, eventually to establish independent homes of their own. This very natural inclination and determination of the girls greatly distressed Mrs. Lantz, and she often shed tears when the matter was mentioned. It was very natural she should be so distressed, as she loved them as if they were her own, and also because she would be without their care, solicitation and genial companionship, and without any one to care for her in her declining years. It appears that in 1915 and possibly earlier she anticipated that the girls would eventually leave her, and it is in evidence that she began to make tentative inquiry for some one to move into the house with her and take care of her in her old age in the event that they should leave. It appears also that she contemplated making such an arrangement with Samantha Moore, who was her blood niece, and who was frequently in her home during the childhood and adolescence of her departed niece, Mrs. Allen. In the year 1915 she sent for Mrs. Moore to come to her home to talk with her about the matter, but at that time it seems that no arrangement was made between them. Mrs. Moore was married and had a good home of her own, and it would be quite a sacrifice for her to leave her established home and undertake the maintenance and care of Mrs. Lantz, who had become old and enfeebled. It appears that on more than one occasion overtures were made to Mrs. Moore in that regard. It became rather generally known that the Allen girls contemplated leaving the Lantz home; and the care, support and maintenance of Mrs. Lantz in that event was discussed among some of the parties plaintiff to this suit, and that they were fully aware of the situation. At the time the deeds were executed Mrs. Lantz was 87 years old, and prior thereto had become enfeebled by sickness, and it appears that in the spring and summer of 1919, and possibly back as far as 1917, her mind

was not clear at times and she had illusions and frequently acted so as to indicate that she was losing control of her mental faculties.　Illustrative of the vagaries which sometimes came into her mind she solemnly announcel to a visitor that several persons were sitting on top 'of the piano and she desired them to be requested to come down and be seated in the room, when, of course, no such persons were there.　At another time she affirmed that a man and a woman had gotten in bed with her and forced her to sleep on the edge until she became very tired, and avowed that she did not know whence they came or whither they went.　She was afflicted with these vagaries and lapses of memory both before and after the time of the execution of these deeds;·and it is upon this evidence that the mental incapacity to execute the deeds is predicated.　On the other hand, it appears that both before, at, and after the time of the execution of the deeds she was in full command of her mental faculties and was capable of transacting her usual affairs with her ordinary acumen.　Her vagaries and lapses were intermittent.　Something like ten witnesses for the plaintiffs were examined on this point of the controversy, while possibly twenty witnesses testified for the defendants. But numbers do not control, either way.　It is well established by our decisions that mere age or infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity in a grantor to execute a deed or will, and that the true date of the test of capacity is the time when the instrument was executed; and that the burden is upon the one seeking to cancel the deed on that ground to affirmatively show that the grantor did not have capacity sufficient to understand clearly the nature and consequence of his act. *Woodville* v. *Woodville,* 63 W. Va. 286.　What then was the condition of Mrs. Lantz at the time she directed the preparation of the deeds in question, and at the time she executed the same?　It appears that when she had concluded to make provision for her future maintenance and support, she having finally lost all hope that the ·Allen girls would remain with her, and having made arrangements with Mrs. Moore to take care of her, she sent for one of the members of the law firm which had always transacted her legal business, and in response thereto Leonard S. Hall came to her home on the 17th

day of September, the day before the deeds were executed, and after consulting with Mrs. Moore and one or more of the Allen girls about the object of his call, he then interviewed Mrs. Lantz, remaining in her company and talking with her over the business in hand for about 30 minutes. He says that he knew she was old and had been sick, and desired to convince himself that she fully understood what she was about. He testifies that her mind was clear and that she gave him specific directions as to how the deeds should be made. She wanted one-half of her land deeded to Mrs. Moore as a consideration for her companionship, care and maintenance, and the other half to go to the Allen girls for the long years of service and affection which they had given her. He told her that the Allen girls did not wish to take one-half of the property for their past services, but that they only desired a small portion of the land (the 32¾ acres) lying near the house, and they wanted Mrs. Moore to have the remainder. Mrs. Lantz then replied that that would be satisfactory to her if it was satisfactory to the girls. A surveyor was called and ran the necessary lines, in company with Mr. Hall. When he and the surveyor returned, Mrs. Lantz was sitting on the front porch, and discussed the matter of the division. He then went home, prepared the deeds as directed, and returned next day in his car in company with his wife and W. F. Newman, with the deeds which were carefully read to Mrs. Lantz, who at that time knew what she was doing and what disposition she was making of the property, and comprehended fully the whole transaction. She signed and acknowledged the deeds before him as notary, and Mr. Newman and the witness signed the deeds as witnesses. His wife was then introduced to Mrs. Lantz, and a short and intelligent conversation ensued between her and the witness and his wife. He was paid $25.00 for his services, one-half being paid by the husband of Mrs. Moore and the other half by Miss Allen. It is argued by counsel for plaintiffs that because of this payment by the grantees it necessarily followed that Mr. Hall was in their employ, representing them and not acting for Mrs. Lantz. Mr. Hall testified that he was transacting the business for Mrs. Lantz, and considered himself as her attorney. Often one party to a contract or trans-

action will pay the attorney for his services, being the result of some arrangement between the parties. We do not think this incident of payment for services of much probative value to establish the fact of mental incapacity on the part of Mrs. Lantz at the time she executed these deeds, nor of undue influence exercised by the attorney and the grantees. The testimony of the notary who took the acknowledgment, on the question of the mentality of the grantor, is of peculiar weight. *Buckey* v. *Buckey*, 38 W. Va. 168.

It is established by witnesses for plaintiff and defendant that Mrs. Lantz, for many years prior to her decease, had often stated that it was her intention and desire to give all of her property to the Allen girls. She loved them as if they were her own children and had said that even if they did leave her (as naturally might be expected in the due course of human affairs), she intended to give them a portion of her property and the remainder to some one who would take care of her after they left. If they staid with her until her decease she intended to give them all. It was but natural that when she found they desired to receive only a small portion of the land, and that the remainder should go to Mrs. Moore, she would be satisfied if the children were satisfied. She wanted all of her property to go to them, and they were, in view of their great love and affection for her, solicitous that the person who took care of her should be well satisfied and remunerated in that arduous duty and undertaking.

Was there any undue influence exercised by them in suggesting this division of the property? Was it defrauding or cheating any one else, who otherwise would have received nothing, if the Allen girls had staid as Mrs. Lantz desired? The Allen girls were solicitous of her care and maintenance in her old days, and it appears that it was the consensus of opinion and efforts that Mrs. Moore should be induced to undertake this duty. "To set aside a deed for undue influence, it must appear that the influence was such as wholly to destroy the free agency of the grantor, and to substitute the will of another for his; and unless such taking away of free agency appears, the showing of a motive and an opportunity to exert such undue influence, together with failing mental powers of the grantor, are not sufficient to overthrow

92 W. Va.

the deed." *Woodville* v. *Woodville,* 63 W. Va. 286, pt. 5 syl.

Recurring to the mental capacity of the grantor when the deeds were made, another witness who was uninterested, a Mrs. Lancaster, who was employed by Mrs. Lantz as a cook and washerwoman, testified that her mind was clear at the time she executed these deeds and that she told her beforehand what disposition she had concluded to make of her property. Other witnesses, a paper hanger, and two tinners who were at work in the house about that time testify that her mind was then clear. We think the allegation of mental incapacity is not sustained. On the contrary, it appears that Mrs. Lantz made a reasonably good bargain. She retained control of the property by express provision in the deeds during her lifetime, and reserved all the rents, issues and profits thereof. Mrs. Moore received nothing for her services, except possibly the maintenance of herself and husband from the farm, until after the death of Mrs. Lantz; and it appears that after the deed was executed Mrs. Lantz rented some of the fields to various persons, and exercised ownership and control over some of the personal estate. She lived about six months and a half after the deeds were executed, and it is asserted that the consideration for the land conveyed to Mrs. Moore is grossly inadequate; that the property she received was worth $15,000, and the services she rendered were worth $643.84 at the rate of $100.00 per month. Life is uncertain, and although it may have been apparent that Mrs. Lantz would not live very long, yet it was a risk which was undertaken by Mrs Moore, which others did not seem inclined to assume. Many are the instances where, contrary to the predictions of physicians and others, old, diseased and feeble persons have lingered many years in a helpless condition and have required constant and exacting attendance. Moreover, it is well said that "where the consideration is that the promisee shall assume a peculiar and domestic relation to the promisor and render to him services of such a peculiar character that it is practically impossible to estimate their value by any pecuniary standard * * * * * the duration of the period during which the services are rendered does not appear to be a matter of great importance. While most contracts of this type are for the balance of the life time of the

promisor, it is not material that the period of expectancy is shortened noticeably by his early death.'' 25 R. C. L. sec. 122. We do not think the deed to Mrs. Moore can be cancelled for inadequacy of consideration. It might have been one of great hardship, dependent upon the length of service which might have been performed; and because the term of service was cut shorter than might have been expected is not a sufficient reason for nullifying the contract. The value of the 32¾ acres deeded to the Allen girls is estimated to be $4,000 or $5,000. Is that sum a sufficient consideration for the loving care and tender solicitude from them to Mrs. Lantz during all these years? We refrain from discussing it.

It is argued that the evidence and circumstances establishes the existence of a conspiracy between Mrs. Moore and the Allen girls to obtain deeds to the property in controversy, and by reason of their confidential relations to Mrs. Lantz, and through their attorney, Mr. Hall, they unduly influenced her to make a bad bargain and obtain the property for a nominal service. We can see nothing more in the conduct of the Allen girls than a commendable desire to see that Mrs. Lantz was carefully and lovingly cared for and attended during the remainder of her uncertain life. They were willing to give nearly, if not quite, all of the property which she had consistently on all occasions announced should be theirs if they remained in her home, to some sympathetic and competent relative who would relieve them of the burden. Overtures were made to others by them and Mrs. Lantz with that view, without avail. It was no secret. Mrs. Haudenschilt, one of the heirs of Mrs. Lantz, had importuned Mrs. Moore to go to the Lantz home in 1919 to see about taking care of the old lady. J. B. Clark, one of the complainants, had approached John Parsons and his wife with the same purpose, and received no satisfaction, and Mrs. Wills, another heir, had agreed to take care of her for $25.00 a week, but could not do so permanently. It may be quite likely that Mrs. Moore and the Allen girls consulted together about the situation. No doubt the matter was laid before Mrs. Lantz. She had realized that she must be taken care of and had stated that she was going to retain a part of her property for that purpose. Was it not addressed to her judgment and

wishes? Was the proposed ministration and care of Mrs. Moore satisfactory to her? Did she have capacity to decide? "Suggestion and advice, addressed to the judgment, are not undue influence. Nor is a deed induced by an appeal on the score of gratitude, past kindness, love or esteem, the result of undue influence." *Delaplain* v. *Grubb*, 44 W. Va. 612. But it is said that her age, sickness and mental weakness rendered her incapable of the exercise of free and independent judgment. We do not think the evidence sustains the allegation of mental incapacity at the time the deeds were made. and executed. It is true the evidence is conflicting. Even if it was equally balanced, or if the appellate court would have decided the point differently in the first place, the lower court would be affirmed where the evidence is conflicting and unsatisfactory. Such is the rule. *Ross* v. *McConnaughy*, 85 W. Va. 199; *Baughman* v. *Hoffman*, 90 W. Va. 388. Mere motive and opportunity to exert such influence, together with failing mental powers of the grantor, do not suffice; it must be such as wholly to destroy the free agency of the grantor and in lieu thereof substitute the will of another.

To sustain appellants' proposition that weakness in mind and body coupled with extreme old age, combined with inadequate consideration in the deeds which were obtained when Mrs. Lantz had no one to give her independent advice, constitutes fraud and undue influence on the part of the grantees which would nullify the deeds, we are cited to *Atlore* v. *Jewell*, 24 U. S. Law Ed. 260; *Griffith* v. *Godey*, 28 U. S. Law Ed. 934; and *Harding* v. *Handy*, 6 U. S. Law Ed. 429. The first two cases were where strangers had obtained the deeds from weak minded grantors fraudulently and for grossly inadequate considerations, and have little application to the present case. In *Harding* v. *Handy* the grantor, Comfort Wheaton, in 1902 began to exhibit symptoms indicating loss of intellect, and soon became, from various causes, incompetent to manage his estate, and died in 1910. His son, Caleb Wheaton, and Handy, a son-in-law, undertook to get the property out of his hands and preserve it for themselves and the other heirs under a declaration of trust. In 1905 Handy procured a conveyance from Comfort Wheaton for a nominal consideration of $2,178, entered upon the property and refused to

account to the other heirs after the death of the grantor, and by a collusive arrangement with Caleb Wheaton, had the property sold for the alleged debts of the deceased grantor and purchased the property at a price below its value.   In the suit to set aside the deed to Handy defendants alleged and sought to prove that the grantor was capable of making the deed, that his intellect was perfectly sound at the time, and that the consideration paid was full and valuable.   The deed was cancelled as fraudulently obtained, the inadequate consideration being one of the badges of fraud, and evidencing the grantor's mental incapacity.

The issues in the case under consideration and the facts fairly deducible from the evidence are governed by the principles of law enunciated and reiterated in our cases enumerated in the syllabus.

The decree is affirmed.

*Affirmed.*