# CHARLESTON.

OLIVER E. MORRIS, *Committee v.* ICY WILLIAMS-GARRISON

(No. 5173)

Submitted May 5, 1925.   Decided May. 12, 1925.

1. DEEDS—*Burden of Establishing Capacity of Grantor of Low
   Intellectual Capacity to Convey, and Good Faith and Fair-
   ness of Transaction, is on Grantee.*

   When it is proven that a grantor in a deed is below the
   average of mankind in intellectual capacity, the law raises
   a presumption against the validity of the deed.   The burden
   of establishing the grantor's capacity to convey, as well
   as the good faith and fairness of the transaction in such case,
   is imposed upon the grantee.   (p. 143).

   (Deeds, 18 C. J. § 515).

2. SAME—*Court of Equity Will Scrutinize Closely Conveyance
   by Grantor of Low Intellectual Capacity and if Unfairness
   is Apparent, Will Annul Deed.*

   A court of equity will scrutinize closely the circumstances
   under which such a conveyance was made.   It may test the
   good faith of the transaction by the adequacy of the con-
   sideration, the influence of the grantee on the grantor, the
   grantor's ignorance, or by his want of disinterested advice.
   If any unfairness is apparent, equity will annul the deed.
   (p. 143).

   (Deeds, 18 C. J. § 164).

NOTE:   Parenthetical references by Editors, C. J.—Cyc.   Not part
        of syllabi.

Appeal from Circuit Court, Marion County.

Suit by Oliver E. Morris, committee of Deforrest Youst, an incompetent, against Icy Williams-Garrison. From a decree for plaintiff, defendant appeals.

*Affirmed.*

*Harry Shaw*, for appellant.

*Scott C. Lowe, H. H. Rose,* and *Tusca Morris,* for appellee.

HATCHER, JUDGE:

On July 15, 1914, one Deforest Youst executed a deed to the defendant, Icy Williams-Garrison (*nee* Icy Williams), for 67.45 acres of land in Marion County, worth approximately $25,000.00. On July 31st, in the same year, Youst was adjudged *non compos mentis* and Oliver E. Morris was appointed his committee. Immediately thereafter, the committee brought this suit in the circuit court of said county, to set aside the deed on the grounds of Youst's incapacity to convey, of undue influence exercised on Youst by the defendant and her family, and of inadequacy of consideration. From a decree in favor of the plaintiff, the case is here on appeal.

The facts developed by the evidence are as follows:

At the time of the conveyance, Youst was 63 years of age, and unmarried. From his childhood, his mentality had been regarded subnormal by his family and the people of the community. He was not insane; neither was he an idiot. He was presumably a moron. As some of the witnesses expressed it, his mind had never "grown up." His father and mother considered him mentally incapable of attending to any business, and managed all his affairs during their lifetime. After their death, one of his brothers looked after him until the brother moved to Pennsylvania. Then, Lorin B. Underwood, one of Youst's nephews, attended to his business. Even defendant's father, Ted Williams, whom the evidence discloses to have feathered his nest at the financial plucking of Youst, testified that Youst himself "didn't do any business of any kind." He could sign his name, but it is questionable whether he could read. He had been the butt of jokes all his life. Because of constant teasing, he was generally distrustful of people. He was easily influenced by friends and was

noticeably susceptible to the blandishments of women. He did chores around the house and went on errands to the store, etc., but had never performed, or attempted any work of consequence.

The tract of 67.45 acres had been purchased for Youst with heirship funds, in order to keep him from wasting the money. His part of royalty on oil from a lease of his father's land, amounting to $5,800.00, had been deposited from time to time to his credit in the banks, either by his brother or by Underwood.

In April of 1914, Underwood leased the Youst place to Williams. Youst lived in a small house on the farm. Williams furnished him board in payment of rent. Williams was an oilwell worker at a wage averaging $75.00 per month. He owned a small place worth $1,300.00. He owed small debts and notes to people in the community. He had several children in addition to the defendant.

In June following the advent of Williams as a tenant, Youst withdrew all of his money from the banks. Immediately, Williams began to pay off notes and accounts, and his girls purchased new clothes and had plenty of money. They seem to have tapped a source from which finance gushed in abundance. New furniture appeared in their home and the noise of a player-piano was heard therein. Williams sold his place for $1,300.00, and acquired a nobler mansion for which he paid $2,600.00 cash. As the Williams family waxed affluent, Youst's fortune waned. The explanation of the coincidence is found in response to the admonition, _cherchez la femme._ His affinity appears in the fair person of the defendant, then unmarried, and _aetat_ eighteen years. Counsel in argument said she was a buxom lass, and ardent was her temperament. The results she obtained credit the observation. Her work was rapid. Shortly before the deed was executed, she and Youst were constantly together. She was frequently seen fondling Youst, and sitting on his lap. There were rumours in the neighborhood emanating from remarks of the Williams family, that she and Youst were to be married. She acquired diamonds. She "often" accepted gifts of money from Youst. His largesse extended to her sisters.

Upon learning that Youst had withdrawn his deposits

from the banks, Underwood sent him word that if he didn't stop spending his money foolishly, he, Underwood, would "try to appoint a guardian" for him. Five days later, Youst executed the deed in question.

Shortly after the deed was made, the defendant married one Charley Garrison, and Williams sold out and moved to Ohio, where he purchased property. He took Youst with him. After several months, the prodigal, having his full of the husks, returned to West Virginia. He complained of rude treatment from the Williams family, which he endured until he was relegated to the barn for sleeping quarters. His money was then gone, his fling ended, and his dream shattered. He was a sadder, if not a wiser man.

The father, mother and sisters of the defendant join with her in denial of any request of, or influence on Youst to make the conveyance. On the contrary, the mother and father state that each besought Youst not to make the deed to the defendant. The father's explanation of the money paid by him in the $2,600.00 purchase is that $1,300.00 thereof was derived from the sale of his first property, and the other $1,300.00 had been saved from his earnings. He admitted that he had never deposited his savings in a bank. He just carried them around in his pocket.

The defendant admitted that Youst frequently gave her five or ten dollars. The older sister made a like admission. The mother recalled that Youst purchased "clothes and things for the girls." The defendant refused to account for her diamonds.

Defendant's answer alleged a valuable consideration for the deed, but we find no evidence that the conveyance was anything but a gift, pure and simple. Two motives prompted Youst in making the deed: one was the wish to thwart the attempt of his kinsmen to control his property, and the other was a desire to furnish the defendant with means to dress as well as any of the girls in the community.

To state the facts in this case is to decide it, as the law applicable thereto is well settled. We find in Youst a grantor who was mentally defective. The attitude of his family and the community in general towards him for more than half a century, and his acceptance thereof, establishes that fact

beyond question. *Jacox* v. *Jacox*, 40 Mich. 473. He was ignorant and incompetent to act for himself. He sought no advice from disinterested parties. He received no adequate consideration for the conveyance; it was merely the outcome of caprice—the sequence of his unconditional surrender— the crowning folly of his infatuation.

Courts are loath to relieve a normal person from the result of indiscretion, but assume a very different attitude toward similar conduct in one *non compos*.

> "Whenever there is great weakness of mind, though not amounting to absolute disqualification, arising from age, sickness, or any other cause, in a person executing a conveyance, and the consideration given for the land is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside.
>
> "When a person, from infirmity and mental weakness, is likely to be easily influenced by others, transactions entered into by such persons without independent advice will be set aside, if there is any unfairness in them."

*Allore* v. *Jewell*, 94 U. S. 506.

> "The mere fact that a man is of weak understanding, is not of itself an adequate ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. But where mental weakness is accompanied by other inequitable incidents, such as undue influence, great ignorance and want of advice, or inadequacy of consideration, equity will interfere and grant either affirmative or defensive relief."

*Sprinkle* v. *Wellborn*, 140 N. C. 163.

> "A court of equity will scrutinize jealously' a transaction as to which there is ground for holding that influence has been acquired over a person of weak mind, and has been abused. The circumstances under which a conveyance was made, the condition of the grantor at the time, and the injustice to him and his heirs if it is upheld, may be such as to cast upon the grantee the burden of showing that it is untainted with undue influence,

imposition, or fraud, but is the intelligent and deliberate act of the grantor.''

*Bennett* v. *Bennett,* 91 N. W. (Neb.) 409.

''Where mental weakness, not of itself sufficient to destroy capacity, is accompanied by undue influence, inadequacy of price, taking advantage of pecuniary necessities, ignorance and want of advice, misrepresentations or concealments, and the like, a contract or conveyance procured by their combined means will be defeated or set aside; it is not a simple presumption of invalidity which thus arises, but the presumption has become established.''

*Pomeroy's Eq. Juris.* 4th Ed. Vol. II, par. 947, note 3.

To the same effect are *Bispham's Pr. of Eq.* 7th Ed. par. 230, Story's Eq. Juris., 14th Ed. par. 1791, Eaton on Equity, par. 132, p. 317, and our West Virginia cases of *Curtis* v. *Curtis,* 85 W. Va. 37, and *Turner* v. *Hinchman,* 72 W. Va. 384.

The defendant has signally failed to overcome the presumption of incapacity which arises from the mental weakness of the grantor, the absence of consideration for the conveyance, and the other circumstances of this case. The very motives actuating the gift, as proven by her, were childish and adequate, and confirm the presumption against its validity. Youst is now an old man in destitute circumstances. It would be inequitable to permit defendant to profit by his impoverishment. Her treatment of him did not merit his gratuity.

The learned judge of the trial court has found that the plaintiff herein is entitled to the relief prayed for in his bill, and has decreed that the deed from Youst to the defendant be annulled. A careful review of the evidence in the case compels the conclusion that his judgment is just. We therefore affirm the decree complained of.

*Affirmed.*