DELENA KADOGAN, *et al.*

*v.*

CHRISTOPHER C. BOOKER, *et al.*

(No. 10302)

Submitted January 16, 1951.      Decided March 1, 1951.

JUDGES, HAYMOND and RILEY dissented.

*James M. Henderson,* for appellants.

*Ross & Ross,* for appellees.

GIVEN, JUDGE:

This appeal involves the correctness of the ruling of the Circuit Court of Raleigh County in setting aside a

deed executed October 13, 1948, by Laura Swain, a widow, conveying unto Christopher C. Booker Lot No. 22 of Section 24 of the Lilly Land Company Central Addition to the City of Beckley, and Lot No. 1 of Section 25 of that addition. Lot No. 22 was acquired by Laura Swain by direct purchase and Lot No. 1 was acquired by her under the will of her husband, Harrison Swain, who died September 7, 1948. A small frame dwelling situated on Lot. No. 1 was occupied by Harrison Swain and Laura Swain as their home until the time of his death, and thereafter by her until her death, November 17, 1948.

. The bill of complaint charges that Booker, knowing that Laura Swain was sick and enfeebled in body and mind, corruptly contrived, schemed, and with intent to defraud, did, by persistent and undue persuasion, importunity and false promises, induce Laura Swain to execute the deed, and that she did not know the true import or meaning of her acts; that the "purported deed was not the act and deed of said Laura Swain by her free agency, but that the same was procured by said Christopher C. Booker through the corrupt, fraudulent and dishonest practices and means aforesaid, by which the will and intent of said Laura Swain, were, by said Christopher C. Booker, wholly overpowered and controlled"; and that Booker did not pay or give unto Laura Swain any consideration whatsoever for the conveyance.

The deed recites that Laura Swain reserved a life estate in the property conveyed, and the consideration therein recited is "* * * the sum of One ($1.00) Dollar, cash in hand paid by the party of the second part to the party of the first part, and in further consideration of the said party of the second part agreeing to make the necessary repairs upon the real estate of the said party of the first part hereinafter described, and other considerations hereinafter mentioned, * * *."

At the date of the execution of the deed Laura Swain was approximately seventy-five years of age, had been blind for several years, and was practically deaf. She was suffering from "malignant hypertension", a condition

involving the "heart, blood vessels and kidneys, with excessive high blood pressure, with general arterial sclerosis, and with a degenerative condition of the kidneys", as testified to by Dr. A. D. Belton. Dr. Belton also testified that "* * * such a condition may or may not affect an individual's mentality. It would depend on just how well the organs function in spite of the degenerative condition. And if the kidneys degenerate to the point where they fail to secrete especially the nitrogenous substances of the body, there usually is mental deterioration along with it, but there are quite a number of individuals who can have this same type of things, and some I have under observation at present, who don't show any mental deterioration." He also stated that "with a condition of this type, there is a gradual deterioration", and that Laura Swain had been suffering with such ailments for at least fourteen years. Her husband died about two months before the date of the deed. They had no children, and the plaintiffs, Delena Kadogan and George Thornton, sister and brother of Laura Swain, were her next of kin.

The sister and her daughter, Mattie Swain, residents of Illinois, came to the Laura Swain home immediately after the death of Harrison Swain and remained with her until after the execution of the deed. Apparently the relatives of Laura Swain were attempting to find some person who would live in the Laura Swain home and furnish her necessary care and assistance. Booker, about seventy years of age, a resident of Washington, D. C., and a distant relative of Laura Swain, came to the Frank Swain home, where Laura Swain was then staying, about one week before the date of the deed. The matter of the care of Laura Swain was apparently discussed by the relatives of Laura Swain and Booker, and on October 13, 1948, Booker, with J. S. Butts, an attorney at law of Beckley, came to the home of Frank Swain, with the deed already written, and, the deed having been read to Laura Swain, she affixed her mark thereto, with the assistance of Mr. Butts, who, as a notary public, certified her acknowledgment thereof.

When asked whether Laura Swain understood the

transaction, Fannie Swain, present at the time of the execution of the deed, stated: "I don't think she did fully, because at the time, during the time that he read it to her, she would just shake her head, or say, 'uh-uh.' ". When asked what Booker was doing at the time the deed was being executed, this witness stated: "Well, he was just patting her. She said, 'What is this?' He was just patting her on the shoulder, and told her everything was going to be all right." Mattie P. Swain, present at the time of the execution of the deed, testified: "Well, I couldn't say she understood it all, No, sir. You see, it was read. She was deaf, and hard to understand. Some of the things she said she understood, some of the things she didn't." J. B. Swain was asked: "She told you at the time she signed the papers she didn't know what she was doing?"; and his answer was, "That's right." Mansion Clark, who lived near the home of Laura Swain and saw her almost daily, asked her if she had conveyed her property to Booker and testified that, "She told me she hadn't, and I told her she had, and she said, 'No, I haven't,' so I said, 'Well, you go to Lawyer Butts and ask him,' and she called him and he told her 'yes,' and she said, 'I aint done no such a thing,' * * *." The attorney was consulted concerning the matter, and apparently wrote Booker, who had returned to Washington. Mattie P. Swain testified that she later, with Delena Kadogan, went to the attorney's office concerning the matter, and that they read a letter from Booker, and that "The contents of the letter read something like this, said, 'Mr. Butts, in receipt of your letter concerning Mrs. Laura Swain, about — concerning Mrs. Laura Swain's property.' He said, 'It is immaterial to me. If she doesn't want me to have the property I don't want it, and I will turn it back over to her.' It seems that Mr. Butts had written him a letter. He said Mrs. Swain wanted her property back, you see, because he hadn't stayed in the house, as he had promised her. That was the letter. So when I went to Mr. Butts to get the letter Mr. Butts said he couldn't find it, because he hunted the letter. We never saw it again. But he said the letter was misplaced, and he hadn't been able to find it." Delena Kadogan testified

to the same effect. The attorney did not testify, and Booker did not mention the letter in his testimony.

It seems clear from the evidence that Booker understood that he was to care for Laura Swain at her home for the remainder of her life. Mattie P. Swain was asked: "Now, at that time did you and your mother ask Mr. Booker to take care of Laura Swain?", to which she answered: "We didn't ask him. He told he—said, 'I will stay here and take care of Laura,' and we said, 'Well, if you will do that all right then. That will be fine if it is satisfactory with Laura.'" This witness was asked about a paper being read at Mr. Butts' office and stated: "Well, I don't remember just what it was all about, but it was concerning Laura Swain's property being turned over to him providing he stayed in the home and took care of her her lifetime. That was the subject of it." Fannie Swain was asked: "Why did she want it (the property) back?", to which she answered: "Well, because Mr. Booker was supposed to have stayed in her home and took care of her, and didn't. She said she wanted it back, and she said she didn't want him to have anything she had."

Within about a week after the deed was executed Booker returned to Washington and did not see Laura Swain again during her life. He made no provision for her care in his absence and apparently had no intention of returning to her home, or to in any way provide for her care. Part of the consideration for the conveyance, as recited in the deed, was that Booker was to "make necessary repairs to the property", but nothing was done by him toward making any repairs, unless his assistance to three other persons in painting two rooms and a hallway in the residence be so considered. As to why he left the home of Laura Swain, Fannie Swain testified: "Well, he got mad at Miss Laura. That is why he left." This witness also testified: "Well, it don't look to me like he ever did anything for her. He didn't do anything for her. Q. Did you ever hear him curse, or say anything out of the way? A. Yes. He told her the night she had asked him for her money, well then, when she asked him for it at the table why he got angry with her, and told her he didn't

want a 'd' thing she had." It is not disputed that J. B. Swain and his wife lived with Laura Swain at her home and rendered her necessary care and assistance from the time of the execution of the deed until her death.

Mattie P. Swain, fifty-two years of age and a niece of Laura Swain, often visited in the Laura Swain home and was at the home for about two weeks after the death of Harrison Swain. She knew of the physical condition of Laura Swain and, in trying to describe her mental condition, she testified: "Q. I believe you stated that some of the time she would talk to herself. A. Some of the time she did. She would go into her room and sit down and talk to herself, and sometimes she would just sit in the room where we were talking to herself, and we would ask her if she was speaking to us, and she said, 'No. I am just talking to myself.' Did the remarks, or what she said, make any sense? A. No. What she said did not make sense, what she was talking about. Just kinda mumbling, you know, to herself. Just mumbling. Incoherent, so that we couldn't really understand just what it was all about."

Royal C. Booze, aged seventy years, a former school teacher, who knew Laura Swain for years, lived near her home and saw her frequently during September, October and November of 1948, testified to the effect that Laura Swain could not, in his opinion, understand "the meaning of the different instruments", meaning the deed; that "She was just as helpless as a baby"; that she was not "physically, and somewhat, I might use the word 'mentally'," capable of doing anything for herself, and that she could not hold an intelligent conversation with him.

Fannie Swain, wife of the brother of Harrison Swain, who lived close to the home of Laura Swain and was familiar with her physical and mental condition and visited her often, testified that Laura Swain "didn't act as if she was at herself"; and that Laura Swain told her, after the deed was executed, that she didn't know what she was doing. Emma J. Allen, a retired school teacher who was well acquainted with Laura Swain, was a close

friend and visited her often over a period of forty years, and "pretty often" during 1948, testified that, in her opinion, Laura Swain "was almost demented"; that she was not able to repeat what she was told; and that, in her opinion, Laura Swain was not "capable of understanding business transactions"; that the mental condition of Laura Swain progressed rapidly after the death of her husband; and that she visited Laura Swain "about two weeks before she died. I don't know whether she knew I was there or not. It didn't look like she did, because she went out from where I was and wouldn't talk to me, and we were very good friends. * * * She didn't seem to know it was me. She couldn't call my name, and she didn't seem to know it."

Mansion Clark, who lived near the Laura Swain home, saw her almost every day over a period of twenty-two years and observed her physical and mental condition, testified to the effect that "* * * she didn't practically have any mind at times"; that her mental condition was "bad", and that "* * * she acted like at times her mind was off. She talked to herself, and she didn't understand what you would be asking her, different questions", and that her mind was worse after the death of her husband. Azzie Jones, who resided close to the Laura Swain home, visited the home often during a period of nineteen years, talked with her almost every day, and was familiar with her physical and mental condition, was asked how her mental condition after the death of her husband compared with her mental condition prior to that time, and stated: "Well, not very good, because it seemed to me she was getting more of a mental sickness. * * * ." When asked if he believed the mental condition of Laura Swain "* * * was such that she would understand and comprehend business transactions, the witness answered: 'I do not.'"

These and other witnesses testified concerning other facts and circumstances which possibly indicate mental incompetency of Laura Swain at the time of the execution of the questioned deed. Some of the statements of

these witnesses indicate that Laura Swain, at the time of the execution of the deed, possessed sufficient mental capacity to understand and comprehend business transactions. This is especially true as to the evidence of Dr. Belton, who stated that in his opinion she did possess sufficient mental capacity to execute a deed. No witness was introduced on behalf of the defendants except the defendant Christopher C. Booker, and he gave no testimony relating to the mental capacity of Laura Swain, to the execution of the deed, to the consideration for the conveyance, to any understanding as to the care and assistance to be rendered Laura Swain by him, or to any material issue of fact. His failure to testify as to such facts, in part at least, is, of course, justified by the provisions of Code, 57-3-1, as amended. The force of that statute, however, does not relieve defendants of the necessity of producing evidence to overcome any fact established *prima facie* by evidence of plaintiffs.

The evidence was heard by the trial chancellor in open court and he found: "* * * that Laura Swain did not have the mental capacity to properly execute, and was not capable of comprehending or understanding her acts and did not so comprehend or understand her acts at the time she executed the deed conveying the property in question to Christopher C. Booker on date of October 13, 1948, and which deed is of record in Deed Book No. 265 at page 191, in the Clerk's Office of the County Court of Raleigh County, West Virginia.

"The court further finds that the defendant, Christopher C. Booker, did exert and exercise undue influence upon Laura Swain at the time she executed said deed on October 13, 1948.

"The court further finds that there was inadequate consideration for said conveyance and also finds that there was a failure of consideration on behalf of Christopher C. Booker for said conveyance." In accordance with the findings the court entered the decree complained of, setting aside and holding the deed in question to be void. This Court must determine whether the evidence suf-

ficiently supports the finding of the trial court. The view the Court takes of the evidence relating to mental incapacity of the grantor makes it unnecessary to consider any other question involved.

There · exists· a presumption that a grantor in a deed conveying real estate was mentally competent to execute the deed. *Ellison* v. *Lockard,* 127 W. Va. 611, 34 S. E. 2d 326. Mere infirmity of mind and body is not sufficient to overcome such presumption. *Burkle* v. *Abraham,* 112 W. Va. 257, 164 S. E. 150. The time of the execution and delivery of the instrument is the time at which the question of mental capacity is to be determined. *Jordon* v. *Cousins,* 128 W. Va. 648, 37 S. E. 2d 890. Evidence of the scrivener, notary public or subscribing witnesses to a deed is entitled to peculiar weight. *Burkle* v. *Abraham, supra.* It is well settled, however, that a lay witness, who has had an opportunity to observe the grantor, may give an opinion as to his mental capacity, if the witness details facts supporting the opinion. *McCary* v. *Traction Co.,* 97 W. Va. 306, 125 S. E. 92; *Freeman* v. *Freeman,* 71 W. Va. 303, 76 S. E. 657. Less evidence is required to establish incompetency where a grantor is aged, and enfeebled in body and mind. *Hardin* v. *Collins,* 125 W. Va. 81, 23 S. E. 2d 916. In the opinion in the *Collins* case, page 87 West Virginia Reports, the Court quoted with approval a statement from 26 C. J. S., Deeds, Section 54, page 268, as follows: "Inadequacy of consideration is persuasive, although not conclusive, evidence of mental incapacity, and where mental weakness and inadequacy of· consideration co-exist they may together furnish ground for invalidating a deed." In the same section of 26 C. J. S. it is also stated: "Where in addition to mental weakness of the grantor it further appears that inequitable circumstances attended the execution of the deed, the courts will the more readily intervene to set it aside." See *Morris* v. *Williams-Garrison,* 99 W. Va. 140, 128 S. E. 78.

As indicated by the evidence detailed above, there can be no doubt of the greatly weakened mental condition of the grantor. She was blind, and practically deaf. She

was afflicted with acute physical infirmities from which she had suffered for more than fourteen years, which apparently caused her death shortly thereafter. Several witnesses who were her close neighbors, and who detailed facts justifying their views, stated that, in their opinions, she was not capable of executing the deed. If the only consideration were the one dollar and repairs to the dwelling, it would clearly be inadequate. If the care of grantor were part of the consideration for the conveyance, as contended by plaintiffs, and which seems probable, the agreement was not kept on the part of the grantee and apparently was not intended to be kept by him, for he returned to Washington about a week after the execution of the deed without having made any provision for Laura Swain's care. In such circumstances we believe the evidence of plaintiffs as to the incompetency of the grantor is plausible and sufficient to support the trial court's finding of mental incapacity.

In *Coulter* v. *Coulter,* 127 W. Va. 710, 34 S. E. 2d 330, this Court held:

"Where the only error assigned as a ground for the reversal of a decree is the failure of the evidence to sustain it, unless the evidence opposed to its finding clearly preponderates it will be affirmed."

We think the following statement of this Court in the opinion in *Curtis* v. *Curtis,* 85 W. Va. 37, 46, 100 S. E. 856, is applicable here. "* * * There are many cases in this jurisdiction in which wills and deeds have been attacked for want of capacity upon the part of the grantors therein. One case furnishes very little light in the determination of another. The relationship of the parties and the conditions which surround them are always different, and the motives which actuate men in the transaction of business are so influenced by these peculiar conditions and circumstances that the decision in one case furnishes little assistance in the determination of another. In this case the learned Judge of the trial court has found that Mrs. Smith did not have mental capacity to make this

deed, and that the same was procured by undue influence. His findings were based upon a careful review of all the evidence and we will not reverse the same unless convinced that they are not supported by the showing made. We cannot say that in this case."

The decree of the Circuit Court of Raleigh County is affirmed.

*Affirmed.*

HAYMOND, JUDGE, dissenting:

I agree with the abstract statement of law in the syllabus of the Court in this case, but I deny its applicability to the facts as disclosed by the evidence. For that reason I dissent from the decision of the majority.

Obviously, the evidence in its entirety can not be set forth in either a majority or a dissenting opinion, and notwithstanding the numerous excerpts from the testimony of several witnesses incorporated in the opinion of the majority, I am satisfied that the evidence introduced in behalf of the plaintiffs is wholly insufficient to support any of the findings of the trial chancellor that Laura Swain, the grantor in the deed under attack, did not have the mental capacity to execute it when it was made on October 13, 1948; that the defendant Christopher C. Booker exerted undue influence upon her at the time of its execution; that the consideration for the deed was inadequate; and that there was a failure of consideration upon the part of the grantee.

The evidence as a whole is not only entirely insufficient to support any of the foregoing findings but it satisfactorily establishes the mental capacity of the grantor to execute the deed in question, erases any vestige of undue influence exerted upon her by the grantee, and shows that the deed was based upon a valid consideration which was substantially satisfied by the grantee.

The only witness who testified about the execution of the deed by Laura Swain on October 13, 1948, was Fannie Swain, who signed the deed as a witness to the mark instead of the signature made by Laura Swain, who could

not write. Those present at that time were Laura Swain, Fannie Swain, the defendant, Christopher C. Booker, and Jonathan S. Butts, who appears to have acted as attorney for both parties to the deed, and who, as a notary, also certified her acknowledgment to the deed. This witness does not say that Laura Swain at that time did not have sufficient mental capacity to execute the deed. It is true that Fannie Swain and several other witnesses testified to the physical infirmities of Laura Swain, who was, and for a number of years had been, afflicted with partial deafness and impaired vision and suffering from arteriosclerosis, but the only statement of Fannie Swain which has any bearing upon the mental capacity of Laura Swain at the time she made the deed in response to the question: "Did Mrs. Swain understand what she was doing? Know what she was doing at the time?" was "I don't think she did fully, because at the time, during the time that he read it to her, she would just shake her head, or say 'uh-uh'". She was then asked: "And when did she learn she had conveyed her property to Mr. Booker, if you know?", to which she replied, "I don't exactly know when she learned it good enough, but after he had treated her —didn't stay with her, why she didn't want him to have it."

The answer of Fannie Swain to the first of the foregoing questions that she did not think Laura Swain fully understood the transaction is ambiguous, and falls far short of an opinion that Laura Swain lacked the mental capacity to execute the deed. It is unreasonable to infer that she would have acted as a subscribing witness to Laura Swain's mark, in the circumstances then present, if she believed that Laura Swain, at the time, was mentally incapable to make the deed or that Mr. Butts, a reputable attorney, who knew and held the confidence of both parties to the deed, would have certified Laura Swain's acknowledgment, if he had believed that she lacked sufficient mental capacity to execute it. Laura Swain may not have "fully" understood the transaction because of inattention or failure to hear some of the words read to her by the attorney, or for other similar

reasons, and at the same time could have been mentally capable of making the deed. Many laymen who are mentally capable to transact business do not "fully understand" legal transactions, which require the services of a lawyer. Laura Swain may not have fully understood the meaning of some of the terms of the deed, which was read to her by Mr. Butts, but it is clear to me from the evidence of Fannie Swain that Laura Swain knew and understood that she was transferring her property to the defendant Booker at the time she executed the deed in the home of Fannie Swain in Beckley on October 13, 1948, in the presence of Fannie Swain, the subscribing witness, Attorney Butts and the defendant Booker.

Fannie Swain's answer to the second of the foregoing questions shows that she believed that Laura Swain, even after she executed the deed and after the beginning of her last illness, had sufficient mental capacity to know and realize that she had conveyed the property to the defendant Booker, to appreciate the consequences, and to entertain the desire to regain it from him; that she knew that he did not intend to take care of her; and that she wanted to get in touch with Attorney Butts to urge him to induce the defendant Booker to cancel the conveyance. Her testimony also reveals incidents in which she and Laura Swain engaged during a period of several weeks before Laura Swain's death, which indicate clearly that she possessed sufficient mental capacity to make the deed under attack in this suit.

The same comment applies to the testimony of the other nonexpert witnesses in behalf of the plaintiffs who expressed the general opinion that she was not mentally capable to execute the deed. None of them saw her during the day of its execution and most of them did not observe her within several days of that occurrence. Some of these witnesses testified about conversations which they had with her both before and after the deed was executed, which make it clear that Laura Swain, though ill and suffering from physical infirmities, was mentally capable to engage in ordinary transactions, and knew and fully understood what she did. Other witnesses in this group

testified to statements made to them by Laura Swain after the execution of the deed, which show that she knew she had made it and that she knew what she was doing when she executed it.

Typical examples of the testimony of these witnesses are these questions to and answers by Mattie P. Swain, a daughter of the plaintiff Delena Kadogan, with respect to incidents which occurred in September, 1948, when she and her mother were in Beckley to attend the funeral of the husband of Laura Swain, Harrison Swain, who died September 7, 1948: "Q. When you came down on a visit in 1948 did Mrs. Laura Swain know you?· A. Oh, yes. * * *. Q. Did she know why you were here? A. Did she know why I was here? Q. Yes. A. I am sure she knew. Yes, sir. Q. Did she know your mother was here in Beckley? A. Yes. After she spoke to her. Q. Did she know why she was here? A. Yes. I am positive she did. * * *. Q. She knew her husband had just died. A. She knew her husband had just died. Yes. Q. There was nothing wrong with her mentality as far as that fact was concerned, was there? A. Not as far as I could see"; and by Azzie Jones, who saw Laura Swain frequently between September, 1948, and the date of her death on November 17, 1948, with regard to her condition: "Q. But my point is, if she heard you, did she understand you? A. Well, if she could hear you generally good and clear it seemed she could get some understanding. Q. If she could hear you she could get some understanding. Is that right. A. Yes, sir. If she could hear you. If it was loud."

J. B. Swain, a distant cousin of Laura Swain, who with his wife moved to Laura Swain's home on October 31, 1948, where she was taken by him at her request, testified that Laura Swain told him she had "signed the property away", which, of course, she had done, but that she was so confused at the time she did not know what she was doing. He also testified that Laura Swain wanted to move from the home of Frank Swain, where the deed was signed, and that he took her to her own home. When asked these questions, he made these answers as to his observation of and conversations with Laura Swain, while

he was living at her home between October 31, 1948, and her death on November 17, 1948: "Q. You had the opportunity of observing Laura Swain most of the day and evening. Is that right. A. Yes. What time I was not working, you know. * * *. Q. You talked to her. You talked to her, did you not? A. Well, yes, sir. I talked to her. Q. And you carried on conversations with her, you and your wife. A. Yes. Q. And you observed her and saw her actions. A. What? Q. You saw her actions. A. Yes, sir. Q. Now, what was her mental condition at that time? Did she know what she was doing? A. Yes. She seemed to know what she was doing part of the *tiem.* Sure. Yes, sir. Q. Now, she was hard of hearing, wasn't she? A. Yes, sir. Q. And she was blind. A. Yes, sir. Q. She was sick. A. Yes, sir. Q. Well, taking all that into consideration, you say she knew what she was doing? A. Well at times. Yes. But she said she didn't know what she was doing when she came up town and signed some papers or something like that. * * *. Q. My question was, did she carry on an intelligent conversation for a woman of her age? A. Well, she talked—she talked very well."

Excerpts from the testimony of Royal C. Booze, Mansion Clark, and Azzie Jones, who did not see Laura Swain on the day she executed the deed, but who doubt that she possessed sufficient mental capacity, are set out in the majority opinion. The evidence of all these witnesses, however, shows that Laura Swain talked intelligently with each of them about various matters at different times, and that she knew what she was doing and understood the subject about which she talked to them. Despite any statements to the contrary by them and other witnesses produced by the plaintiffs and their evidence of the illness and the physical infirmities of Laura Swain, their testimony shows clearly that she talked intelligently and understood the matters about which she talked and that she possessed sufficient mentality to make the deed which she executed on October 13, 1948.

Dr. A. D. Belton was the only expert witness who testified in the case. He was Laura Swain's family phy-

sician and treated her professionally ait different times between July 9, 1934, and October 17, 1948, when he last attended her. At that time, which was four days after she executed the deed on October 13, 1948, Dr. Belton, who examined her, found no change in her mental condition as he had observed it since he began to treat her in 1934. With regard to the physical and mental condition of Laura Swain when he treated her on October 17, 1948, Dr. Belton was asked these questions and gave these answers: "Q. And what was her condition physically on October 17, or the last time you saw her? * * *. A. She was gradually failing at that time physically, because I noticed she developed what we call cardiac dermatitis, in which her heart muscles were giving way to some extent, with what we call pulmonary edema, with *evtravisation* of blood into her lungs. That is what she had at that time, but even so she seemed to me, in my opinion, to be fairly mentally sound, that is, even so, irrespective of her condition, and she made complaints, fussed, and tried to get up, and I take it along that line she seemed to be fairly well, in my opinion, mentally, but, of course, she was physically bad off. * * *. Q. Doctor, you had known Laura Swain for quite some years, had you not, sir? A. Yes, sir. Q. You testified you attended her on October 17, 1948 for a heart conditiin. A. Yes, sir. Q. And I believe you stated she was mentally sound as far as you knew. Is that right? A. Yes, sir. As car as I could ascertain from my own observation and such examination as I did, I couldn't find any difference in her mental make-up. Q. In other words, you noticed no difference in her mental make-up from 1934 up until October, 1948. A. That's right. Q. What was her mental make-up? Good or bad? A. Well, I would say she had a fairly good mental make-up. She had a very—In fact I would call it an unusually capable memory, especially for remote and recent events."

The statement in the majority opinion: "Mattie P. Swain, present at the time of the execution of the deed, testified: 'Well, I couldn't say she understood it all, No, sir. You see, it was read. She was deaf, and hard to understand. Some of the things she said she understood,

some of the things she didn't.'" is erroneous. Mattie P. Swain was not present when Laura Swain executed the deed in the home of Fannie Swain in Beckley on October 13, 1948. At that time Mattie P. Swain was in Illinois where she lived and was not in Beckley where the deed was made. That fact is made clear by this undisputed testimony of Mattie P. Swain: "Q. You were here after Harrison's death the seventh of September? A. That's right. In September. Seventh day of September. Q. After that when was the next time you came back? A. The next time I came back was to Laura Swain's funeral, which was in November. * * *. Q. You were not here then on the day in October—or after you returned home following the seventh of September. A. No. Q. And did not come back until after the seventeenth— A. After the seventeenth of November. Q. After the seventeenth of November, 1948. A. That's right." The foregoing excerpt from her testimony, quoted in the majority opinion, relates to an entirely different transaction which occurred in the office of Attorney Butts shortly after September 7, 1948. At that time Laura Swain, Mattie P. Swain, the plaintiff Delena Kadogan, the defendant Booker, and Mr. Butts were present in his office. On that occasion, Mr. Butts read aloud a draft of an agreement involving the care and the maintenance of Laura Swain and the quoted statements of Mattie P. Swain related to that occurrence. The draft of that agreement was not introduced in evidence and its contents are not disclosed by the record. That portion of the testimony of Mattie P. Swain shows that Laura Swain, at the time, was physically able and mentally capable to go to the office of Mr. Butts and to participate in that transaction. The error in the statement in the majority opinion that Mattie P. Swain was present at the time of the execution of the deed is, of course, due to inadvertence and is unintentional but the statement, nevertheless, is entirely erroneous.

On the vital question of the mental capacity of Laura Swain to make the deed of October 13, 1948, the evidence of Dr. Belton is entitled to great weight, and, in my judgment, clearly establishes her mental capacity to ex-

ecute that transaction. He definitely fixes the time that he observed, examined and treated her when she was ill on the fourth day after she executed the deed, and when he did so, he found her, even though ill, to be mentally competent. The opinions of the other nonexpert witnesses on that point were based upon their observation of Laura Swain at different times which, with reference to the time of the execution of the deed, are not fixed or definite but are entirely too remote and uncertain. They saw her, either before or after October 13, 1948, upon occasions which were several days, a few weeks, or even longer removed from the time of the execution of the deed. It is also obvious that all the witnesses who questioned the mental capacity of Laura Swain thought she was incapable of making the deed because of her physical condition and that they knew little, if anything, about her mental capacity. In consequence, their opinions are entitled to little or no weight. "The mere *opinions* of witnesses not experts are entitled to little or no regard: unless they are supported by good reasons founded on facts which warrant them: and if the reasons and facts upon which they are founded are frivolous, the *opinions* of such witnesses are worth but little or nothing." Point 10, syllabus, *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Kerr* v. *Lunsford*, 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668; *Farnsworth* v. *Noffsinger*, 46 W. Va. 410, 33 S. E. 246; *McPeck* v. *Graham*, 56 W. Va. 200, 49 S. E. 125.

The opinions of the nonexpert witnesses in this case invite comparison with those of the same type of witnesses who testified, in a general way, in *McPeck* v. *Graham*, 56 W. Va. 200, 49 S. E. 125, that Mrs. McPeck, the grantor in the deed attacked but by this Court sustained in that suit, was not sane. In the opinion in the *McPeck* case, this Court said: "We cannot lightly overthrow muniments of men's titles on trivial evidence, leaving the mind unwilling to do so. The depositions show seven non-expert, non-professional witnesses testifying in a general way, that, in their opinion, Mrs. McPeck was not sane. They give no defined reasons. They say she was eccentric; would stand and say nothing; would take chil-

dren and wander over premises when visiting, and say nothing to people, and stand silent and apparently troubled. No violent action was shown, no raving mania. We can explain her silence and melancholy on rational ground." In commenting upon certain conduct of Mrs. McPeck, the grantor, in refusing to sign the deed and in later signing it through fear of an attack upon her title by creditors of her husband and because of his threats to leave home, upon which acts and other similar acts nonexpert witnesses based their opinions that she was not sane, this Court said: "Now, this evidence, if true, and it is claimed by the plaintiffs to be true, proves that she knew the effect of the deed, and establishes her mental capacity to execute it. It shows that at the very moment of the execution of the deed she knew its character, and that is the moment of time, above all other times, that controls in deciding upon capacity. *Delaplain v. Grubb,* 44 W. Va. 612. This evidence of the plaintiff ought alone sustain the deed." This statement in the opinion in the *McPeck* case is applicable to the testimony of the non-expert witnesses in this case concerning acts of Laura Swain and her conversations with them relating to the deed and the property conveyed by it, both before and after the execution of the deed, and the testimony of some of these witnesses that Laura Swain, after the deed was made, knew that she had executed it and conveyed the property and that she wanted to get in touch with Attorney Butts in her desire to regain it from the defendant Booker. This evidence, in the words of this Court in the *McPeck* case, "ought alone sustain the deed."

In contrast with the insufficient opinion evidence of the nonexpert witnesses in behalf of the plaintiffs, which does not support the finding of the trial chancellor, the opinion evidence of Dr. A. D. Belton, an expert witness, also produced by the plaintiffs, that Laura Swain was mentally sound when he examined her on the fourth day after she executed the deed, is entitled to great weight. "The evidence of physicians, especially those who attended the grantor, and were with him considerably during the time it is charged he was of unsound mind, is

entitled to great weight." Point 8, syllabus, *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Kerr* v. *Lunsford*, 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668; *Delaplain* v. *Grubb*, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; *Ward* v. *Brown*, 53 W. Va. 227, 44 S. E. 488. When a deed is assailed on the ground that the grantor is without mental capacity to make it, the time at which the question of mental capacity is to be determined is the time at which it is signed, acknowledged and delivered. *Jordan* v. *Cousins*, 128 W. Va. 648, 37 S. E. 2d 890; *Ellison* v. *Lockard*, 127 W. Va. 611, 34 S. E. 2d 326; *Wade* v. *Sayre*, 96 W. Va. 364, 123 S. E. 59; *Martin* v. *Moore*, 92 W. Va. 671, 115 S. E. 833; *Woodville* v. *Woodville*, 63 W. Va. 286, 60 S. E. 140; *McPeck* v. *Graham*, 56 W. Va. 200, 49 S. E. 125; *Delaplain* v. *Grubb*, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; *Buckey* v. *Buckey*, 38 W. Va. 168, 18 S. E. 383; *Jarrett* v. *Jarrett*, 11 W. Va. 584.

It is pertinent here to reiterate some basic well established principles in this jurisdiction by which the mental capacity of a grantor is determined when his deed is assailed on the ground of his mental incapacity to make it, which should have been, but were not, applied in this case. The legal presumption is that the grantor is sane and possessed of sufficient mental capacity to make a deed at the time of its execution, and the burden of proving that he was not then competent rests upon him who attacks its validity. *Ellison* v. *Lockard*, 127 W. Va. 611, 34 S. E. 2d 326; *Wade* v. *Sayre*, 96 W. Va. 364, 123 S. E. 59; *Black* v. *Post*, 67 W. Va. 253, 67 S. E. 1072; *McPeck* v. *Graham*, 56 W. Va. 200, 49 S. E. 125; *Delaplain* v. *Grubb*, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; *Buckey* v. *Buckey*, 38 W. Va. 168, 18 S. E. 383; *Jarrett* v. *Jarrett*, 11 W. Va. 584. Old age is not in itself sufficient evidence of incapacity to make a deed. *Martin* v. *Moore*, 92 W. Va. 671, 115 S. E. 823; *Jarrett* v. *Jarrett*, 11 W. Va. 584. Mere infirmity of mind and body is insufficient to overcome the legal presumption of the mental capacity of a person who has executed a will, a deed, a contract, or other instrument. *Ellison* v. *Lockard*, 127 W. Va. 611, 34 S. E. 2d 326; *Burkle* v. *Abraham*, 112 W. Va. 257, 164 S. E. 150; *Doak*

v. *Smith,* 93 W. Va. 133, 116 S. E. 691; *Martin* v. *Moore,* 92 W. Va. 671, 115 S. E. 833; *Barnett* v. *Greathouse,* 77 W. Va. 514, 88 S. E. 1013; *Woodville* v. *Woodville,* 63 W. Va. 286, 60 S. E. 140; *Bade* v. *Feay,* 63 W. Va. 166, 61 S. E. 348; *Teter* v. *Teter,* 59 W. Va. 449, 53 S. E. 779.

The vague and general opinions of the nonexpert witnesses in this case with reference to the mental condition of Laura Swain at times other than the time she executed the deed do not overcome the legal presumption that she was mentally capable to make the deed on October 13, 1948. At most their testimony shows merely old age and infirmity of mind and body which are insufficient to overthrow that presumption, and the entire evidence produced in behalf of the plaintiffs does not satisfy the burden which rested upon them to prove clearly that she did not possess the mental capacity to make the deed when she executed it on October 13, 1948.

The evidence in behalf of the plaintiff is manifestly insufficient to sustain their charge that the defendant Booker exerted undue influence which caused Laura Swain to make the deed. The only evidence on that point is the testimony of Fannie Swain that when the deed was executed the defendant Booker was "just patting" Laura Swain on the shoulder; that she said "What is this?"; and that he "told her everything was going to be all right." Manifestly this conduct of the defendant in the presence of Fannie Swain, in whose home Laura Swain was then living, and of a reputable attorney who was assisting each party to the deed in its execution, acknowledgment and delivery, did not constitute undue influence upon Laura Swain by the defendant Booker. To set aside a deed on the ground of undue influence it must be shown that such influence destroyed the free agency of the grantor and substituted the will of another person for that of the grantor, and unless these facts appear, motive and opportunity to exert undue influence and failing mental powers of the grantor are insufficient to set aside or cancel the deed. *Doak* v. *Smith,* 93 W. Va. 133, 116 S. E. 691; *Barnett* v. *Greathouse,* 77 W. Va. 514,

88 S. E. 1013; *Ritz* v. *Ritz,* 64 W. Va. 107, 60 S. E. 1095; *Woodville* v. *Woodville,* 63 W. Va. 286, 60 S. E. 140; *Erwin* v. *Hedrick,* 52 W. Va. 537, 44 S. E. 165; *Farnsworth* v. *Noffsinger,* 46 W. Va. 410, 33 S. E. 246. The evidence fails to show that the defendant Booker, at any time, had any opportunity to exert undue influence upon Laura Swain, and the finding of the trial chancellor that he exerted such influence is entirely without evidence to support it. Suggestion and advice, or appeals, based upon gratitude, past kindnesses, or love and esteem, do not of themselves constitute undue influence. *Martin* v. *Moore,* 92 W. Va. 671, 115 S. E. 833; *Delaplain* v. *Grubb,* 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; *Hale* v. *Cole,* 31 W. Va. 576, 8 S. E. 516.

The findings of the trial chancellor that the consideration for the deed was inadequate and that there was failure of consideration upon the part of the defendant Booker are also not supported by the evidence. The consideration stated in the deed was the sum of one dollar, the agreement of the grantee to make necessary repairs to the real estate conveyed, and the reservation by the grantor of a life estate in the property and the right to use and occupy it during the remainder of her natural life. The value of the property granted is not shown by any evidence. The deed recites that the sum of one dollar was paid by the grantee to the grantor, and as this recital is not rebutted by the evidence of any witnesses, the payment of that amount is sufficiently established. *Oates* v. *Oates,* 127 W. Va. 469, 33 S. E. 2d 457; *Bulick* v. *Milkint,* 90 W. Va. 509, 111 S. E. 310. The undisputed evidence is that Laura Swain held and enjoyed the life estate reserved to her as part of the consideration, and that she used, occupied and possessed the property for some time prior to and at the time of her death. The evidence also shows that the defendant Booker made or assisted in making certain repairs to the property and the repairs so made appear to be the "necessary repairs" mentioned in the deed as part of the consideration for the conveyance of the property. The repairs consisted of the painting of a part of the residence occupied by

Laura Swain and the construction of a new toilet. Fannie Swain, having been recalled as a witness as to those items, gave this testimony on her examination in chief: "Q. To your knowledge did Mr. Booker make any improvements on the home of Laura Swain? A. Well, we did some painting. Q. Who did the painting? A. Well, my husband, and Billie Anderson and I, and he painted some. A little. He helped. Q. Was that before she moved back to her home? A. Yes, sir. * * *. Q. How many rooms were painted? A. Well, we painted two rooms and the hall." On cross-examination she was asked these questions and gave these answers: "Q. Mrs. Swain, at the time you testified that you were painting the house, was Mr. Booker there too? A. Yes. He was. Q. And he was painting. A. Yes. Q. At or about that same time did he build a new toilet at that house? A. Yes. Q. At about the same time were any of the bed rooms—were they disinfected? A. Any what? Q. Were the bed rooms disinfected? Were they scrubbed out and cleaned? A. Yes, They was. Q. I see. When you, and Mr. Booker, and your husband were doing that work— A. Yes. Q. About what time was it? Do you remember the month? Was it shortly before Mrs. Swain was taken back to her home? A. No. That was before. Q. That was before that. A. Yes. * * *. Q. And I believe you say you did the cleaning of the house and then Laura moved in. A. It was already clean. We was cleaning on it when he left. Q. Who was cleaning on it? A. My husband, Mr. Booker, and I. * * *. Q. I see. When the house was ready to live in, and clean, why she was moved back in. Is that right? A. Yes. That's right." This Court has held that one dollar constitutes a valuable consideration for a conveyance, Lovett v. Eastern Oil Company, 68 W. Va. 667, 70 S. E. 707; and a conveyance may not be invalidated because of inadequacy of consideration made by a person capable of making it, when no rights of creditors are involved and no undue influence, duress, fraud or other vitiating circumstance is shown. Oates v. Oates, 127 W. Va. 469, 33 S. E. 2d 457; Jarrett v. Jarrett, 11 W. Va. 584; Deem v. Phillips, 5 W. Va. 168.

Some of the witnesses in behalf of the plaintiffs testified generally but vaguely about an understanding or agreement by the defendant Booker to care for Laura Swain in connection with her conveyance of the property, and with reference to that matter the majority opinion contains this statement: "It seems clear from the evidence that Booker understood that he was to care for Laura Swain at her home for the remainder of her life." The evidence, however, utterly fails to establish any definite or valid written or verbal agreement of that nature. Mattie P. Swain testified that while she was in Beckley and before she left shortly after September 7, 1948, she, her mother, Laura Swain and the defendant Booker were at the office of Attorney Butts and that at that time he read a paper to Laura Swain which she signed by her mark. This instrument, whatever its character, was not introduced in evidence and the plaintiffs offered no proof to show the nature of its terms and provisions. In short, there is no proof of any written contract which contradicts or varies the terms of the deed or which required the defendant Booker to care for Laura Swain in connection with her conveyance of the property to him. Mattie P. Swain and other witnesses for the plaintiffs testified to oral statements of the defendant Booker to the effect that he would take care of Laura Swain. All these transactions, however, occurred before the execution of the deed, which contains no provision of that kind, and any prior verbal agreement inconsistent with or different from the terms and the provisions of the deed was, of course, superseded by that written instrument and can not contradict, add to, or vary its clear and express provisions or adversely affect its validity.

The conduct of the plaintiffs with respect to this litigation calls for comment. Delena Kadogan appears to be a sister and George Thornton a brother of Laura Swain but they showed no interest whatsoever in her personal comfort or welfare during the last years of her life. Both were nonresidents of this State and George Thornton neither visited his sister during her last illness nor appeared personally in this suit. Neither Delena Kadogan

nor her daughter, Mattie P. Swain, was willing to live with or care for Laura Swain, though they must have known in September, 1948, that her end was near, and it was at the instance of Delena Kadogan that the defendant Booker was induced to leave his home and employment in Washington, D. C., to come to Beckley to enter into the negotiations with Laura Swain which resulted in the execution of the deed which Delena Kadogan and her brother have assailed in this suit. The only interest of the plaintiffs in Laura Swain appears to have been to get the property which, as a result of the negotiations instigated by Delena Kadogan, Laura Swain voluntarily conveyed to the defendant Booker, and the decision of the majority now permits them to accomplish their purpose to have it.

As already pointed out, the findings of fact of the trial chancellor, upon which the final decree is based, are not supported by the evidence. When that situation exists the decree should be reversed. In *Central Trust Company v. Cook,* 111 W. Va. 99, 160 S. E. 561, this Court held, in point 2 of the syllabus, that "The decree of a trial chancellor on an issue of fact will be reversed where there is insufficient evidence to support it." See also *deStubner v. United Carbon Company,* 126 W. Va. 363, 28 S. E. 2d 593; *Williamson v. Levine,* 75 W. Va. 143, 83 S. E. 281; *State v. Miller,* 26 W. Va. 106; *Ewell v. Lambert,* 177 Va. 222, 13 S. E. 2d 333. In addition to the insufficiency of the evidence to support the findings and the decree of the trial chancellor, the plain preponderance of the evidence is in favor of the validity of the deed made by Laura Swain on October 13, 1948, and the contrary findings of the trial chancellor are plainly wrong. When it appears that a decree, based on conflicting evidence, is contrary to the preponderance of the evidence or is clearly wrong, it should be reversed on appeal. *Mullens v. Lilly,* 123 W. Va. 182, 13 S. E. 2d 634; *LaFollette v. Croft,* 122 W. Va. 727, 14 S. E. 2d 917; *Tokas v. Arnold,* 122 W. Va. 613, 11 S. E. 2d 759; *Buskirk v. Bankers Finance Corporation,* 121 W. Va. 361, 3 S. E. 2d 450; *Pickens v. O'Hara,* 120 W. Va. 751, 200 S. E. 746; *Gall v. Cowell,* 118 W. Va. 263, 190

S. E. 130; *Smith* v. *Pew,* 116 W. Va. 734, 183 S. E. 53; *Lemen-Downs* v. *Beltzhoover,* 111 W. Va. 207, 161 S. E. 440; *Jones* v. *Hoard,* 108 W. Va. 308, 151 S. E. 183; *Meyers* v. *Washington Heights Land Company,* 107 W. Va. 632, 149 S. E. 819; *Blue* v. *Hazel-Atlas Glass Company,* 106 W. Va. 642, 147 S. E. 22; *Hendrick* v. *Jenkins,* 104 W. Va. 486, 140 S. E. 483; *Rice* v. *Rice,* 88 W. Va. 54, 106 S. E. 237; *McGraw* v. *Morgan,* 81 W. Va. 331, 94 S. E. 370; *Wallace* v. *Douglas,* 58 W. Va. 102, 51 S. E. 869; *Pearson* v. *West Virginia Lime and Cement Company,* 56 W. Va. 650, 49 S. E. 418. Proper application of either of the foregoing principles, in my judgment, requires reversal of the final decree of the trial court.

For the reasons stated, I would reverse the decree of the Circuit Court of Raleigh County and dismiss this suit.

I am authorized to say that Judge Riley concurs in the views expressed in this dissent.