GARNETT SHEPPARD, EXTRX., *etc., et al.*

CLAY PEACOCK COAL CO., INC., *and*

COOLRIDGE ENERGY CORP.

(No. 14972)

Decided January 19, 1982.

*Sayre and Sayre* and *Robert B. Sayre,* for appellants.

*Lynch, Mann and Knapp* and *Norman Knapp, Thornhill, Kennedy and Vaughan* and *W. A. Thornhill, III,* for appellees.

MILLER, CHIEF JUSTICE:

Appellants, who are the Executrix and devisees of certain real estate under the will of George W. Brammer, complain that the circuit court erred in not setting aside a deed that he executed on February 22, 1975, which conveyed the property to the Clay Peacock Coal Company, Inc., (Clay Peacock). Clay Peacock, in turn, first leased and then conveyed the property to Coolridge Energy Corporation (Coolridge). Clay Peacock and Coolridge are the appellees here and the defendants below. Appellants claim that because of George Brammer's advanced age, health, and mental condition at the time the deed was signed, coupled with the inadequacy of the consideration, the deed should be set aside.

Before the conveyance on February 22, 1975, Brammer entered into two separate option agreements on the

property. The first option was between Brammer and Arthur Banks, dated June 17, 1974. Banks paid $100 for the option. The final purchase price was to be $14,000, and the option period was for 120 days. The June 17, 1974, option expired on October 16, 1974. On November 5, 1974, Brammer gave a second option on the property. This time the option was taken by Banks Engineering Company; the terms were the same as set forth in the June option.

On October 27, 1976, Clay Peacock conveyed the property in question to Coolridge for $100,000, which represented advance payment for the first 100,000 tons of metallurgical coal mined.[1] Thereafter payments would be made by Coolridge to Clay Peacock of $1.50 per ton for metallurgical coal mined. To date, approximately 76,116 tons of coal have been mined at a sale price of between $34.00 and $50.00 per ton.

The record suggests that Clay Peacock envisioned a lease or transfer of the land to Coolridge at the time Brammer signed the deed. The record also indicates that some of the same individuals share ownership in Clay Peacock and Coolridge. Those persons involved in the lease and purchase of the land testified that Brammer was mentally competent at the time he signed the options and the deed. Jack Pedro and his immediate family, all devisees under the will, testified that Brammer began to deteriorate mentally and physically after his home burned in June 1974 and became generally incompetent by Christmas 1974. Thus, testimony by parties interested in the outcome of the case varied.

Disinterested parties also had different views. One attorney who had dealt with Brammer as a client during this period felt he was confused and had difficulty communicating with him. The attorney who actually

---

[1] Previously, on June 23, 1976, Clay Peacock leased to Coolridge the Brammer properties. The lease called for a sum of $200,000 in advance royalties. After 400,000 tons of metallurgical coal had been mined, Coolridge would begin payment of $1.00 per ton for metallurgical coal mined thereafter. This lease apparently did not become operative in light of the October 1976 deed.

drafted the legal documents involved here and who did a title search on Brammer's property at his request felt he was competent but his contact with Brammer was limited after the Fall of 1974.

From the record it is difficult to determine all of the legal arguments advanced by the parties in the court below. It does appear from the court's memorandum opinion that it was of the view that Brammer was competent when he executed the deed in February 1975 and that the purchase price was adequate because Clay Peacock did not make any money mining the coal. As to the inadequacy of the purchase price, we do not agree that whether Clay Peacock made any profit in the ultimate mining venture is controlling.

This lack of profit could be a result of poor management, bad market conditions or other factors unrelated to the actual value of the coal property. More relevant is the fact that the purchasers from Brammer received initially $100,000 on the resale of the property to Clay Peacock. This fact suggests an inadequacy of the initial purchase price particularly in view of the evidence that the purchasers had already arranged the resale at the time the option was exercised.

We have recognized that the inadequacy of the purchase price standing alone may not be sufficient to set aside a deed particularly where the price is not grossly inadequate. *O'Dell v. Lawrence*, 91 W. Va. 96, 112 S.E. 297 (1922). However, where there is an inadequacy of purchase price coupled with mental infirmity of the grantor, the two conditions together may be sufficient to warrant setting aside the deed. In *Kadogan v. Booker*, 135 W. Va. 438, 446, 66 S.E.2d 297, 301-02 (1951), we summarized these points in this fashion:

> "There exists a presumption that a grantor in a deed conveying real estate was mentally competent to execute the deed. *Ellison v. Lockard*, 127 W.Va. 611, 34 S.E.2d 326 [1945]. Mere infirmity of mind and body is not sufficient to overcome such presumption. *Burkle v. Abraham*, 112 W.Va. 257,

164 S.E. 150 [1932]. The time of the execution and delivery of the instrument is the time at which the question of mental capacity is to be determined. *Jordon v. Cousins*, 128 W.Va. 648, 37 S.E.2d 890 [1946]. . . . Less evidence is required to establish incompetency where a grantor is aged, and enfeebled in body and mind. *Hardin v. Collins*, 125 W.Va. 81, 23 S.E.2d 916 [1943]. In the opinion in the *Collins* case, page 87 of W.Va., page 919 of 23 S.E.2d, the Court quoted with approval a statement from 26 C.J.S., *Deeds*, § 54, page 268, as follows: 'Inadequacy of consideration is persuasive, although not conclusive, evidence of mental incapacity, and where mental weakness and inadequacy of consideration co-exist they may together furnish ground for invalidating a deed.' In the same section of 26 C.J.S. it is also stated: 'Where in addition to mental weakness of the grantor it further appears that inequitable circumstances attended the execution of the deed, the courts will the more readily intervene to set it aside.' See *Morris v. Williams-Garrison*, 99 W.Va. 140, 128 S.E. 78 [1925]." (Dates and italics added)

In *Kadogan*, this Court affirmed the setting aside of a deed given by a widow seventy-five years of age who suffered from high blood pressure, kidney failure and arterial sclerosis and who was blind and partially deaf. The consideration was one dollar and the making of necessary repairs on a small house where she lived. The widow had reserved a life estate, and died within a month after executing the deed. In *Hardin v. Collins*, 125 W. Va. 81, 23 S.E.2d 916 (1943), the grantor was a widow sixty-four years of age who had recently lost her two sons. She suffered from rheumatism, neuralgia and stomach trouble for which she took codeine. The purchase price to be received by the widow was either one dollar or two unsecured notes for $100 each while and the fair value of the property was $2,000. This Court affirmed setting the deed aside commenting that "[t]he consideration, therefore, [was] grossly inadequate." *Hardin*, 125 W. Va. at 86, 23 S.E.2d at 918.

Here, the trial court appears to have considered the inadequacy of the purchase price and the mental incompetency of the grantor Brammer as separate theories on which to cancel the deed. In finding the purchase price not grossly inadequate, it rejected that theory. As to the mental incompetency of the grantor, the trial court concluded that he was mentally competent and, therefore, refused relief on that ground. However, the critical question not addressed was whether the combination of inadequate purchase price and mental infirmity of the grantor warranted setting the deed aside under *Kadogan* and *Hardin, supra.* In this respect we believe the trial court erred.

The grantor's physical condition is largely undisputed. He was ninety-three years of age when he signed the deed. He was hard of hearing, had poor eyesight and could not read or write except to sign his name. He suffered from arteriosclerstic cardiovascular disease and cancer from which he died within four months after signing the deed. Further evidence exists as to his physical and mental infirmities which when coupled with the inadequacy of the purchase price clearly place this case within the range of *Kadogan* and *Hardin.*[2]

Because the trial court initially determined that the appellants had no cause of action to set the deed aside it dismissed this case without determining the other defenses asserted by the appellees. We reverse the trial court's ruling and remand the case for further consideration in light of the principles set out in this opinion.

*Reversed and remanded.*

[2] Neither party has raised the question of the effect of the option given in November 1974 as controlling the date of determining the mental infirmity of the grantor and we decline to address this point on appeal.